**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Melvin S. BORNSTEIN, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Nathan GROSSGOLD, Defendant-Appellant.**

**Nos. 17860, 17861.**

United States Court of Appeals, Seventh Circuit.

June 9, 1971.

Certiorari Denied Oct. 12, 1971.
See 92 S.Ct. 88.

Robert S. Bailey, Ralph E. Brown, Chicago, Ill., for defendants-appellants; William J. Essig, Chicago, Ill., of counsel.

William J. Bauer, U. S. Atty., Richard A. Makarski, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before KILEY and CUMMINGS, Circuit Judges, and MORGAN, District Judge.[1]

KILEY, Circuit Judge.

Defendants Bornstein and Grossgold were each convicted by a jury under nine counts of an indictment charging violations of 18 U.S.C. § 1341 in the use of mail to further a scheme to defraud. Both have appealed. We affirm.

Bornstein and Albert Rosenthal, a "relative" of Bornstein, formed the Whitehall Insurance Company in 1961. In May, 1961, they acquired an inactive insurance company and activated it under the name of Whitehall Mutual Fire and Marine Insurance Company. Bornstein's brother-in-law, Grossgold, a New York attorney, became claims manager of Whitehall in 1962. In March of 1963 his employment by Whitehall was terminated, but as an independent attorney working in the Whitehall office building he continued to handle subrogation claims for Whitehall against other insurance companies on a percentage basis. It is upon the falsity in documents supporting the subrogation claims filed by Grossgold that the charges of fraud before us are based.

Whitehall ceased doing business in December of 1963, and its assets and records were turned over to the Illinois State Bureau of Liquidations in November of 1964. The indictment before us was filed in June, 1968.

Each defendant contends that the evidence is insufficient to sustain the verdict against him; that he was denied his constitutional right to a speedy

---

1. Judge Morgan of the Southern District of Illinois is sitting by designation.

trial; that reversible error was committed by the court's denial of a severance of his trial from that of the other; and that he was prejudiced by denial of continuance to obtain another lawyer.

I.

Defendants contend there is insufficient evidence to support the guilty verdicts. We see no reason to discuss in detail the abundant proof adduced at trial to sustain the verdict. The fraudulent scheme was shown by the testimony of Palumbo, one of the garage owners involved in the scheme, that either Bornstein or Grossgold would call him to make arrangements for repair of a damaged automobile covered by a Whitehall policy. After examining the car, Palumbo would make up a written estimate for the cost of repairs and convey it to Whitehall, and an agreement would be made between Palumbo and Bornstein or Grossgold to repair the automobile at a cost lower than the estimate. The estimate, marked "paid," would then be sent to the insurer of the person whose car collided with that of Whitehall's insured, along with a subrogation claim written by Grossgold. Whitehall would then be paid the amount stated on the estimate.

This testimony was fully corroborated by Whitehall's files. For example, insured Baugh's file, used in proof of Count V, contains an estimate on Palumbo's stationery in the amount of $190.25, marked "paid;" a cover letter written by Grossgold to Economy Fire and Casualty Co., insurer of the driver of the other automobile involved in the Baugh collision, referring to "the paid repair bill in the amount of $190.25" which was sent with the letter; and a check from Economy in the amount of $190.25 made payable to Baugh and/or Grossgold. The file also shows a bill from Palumbo for "agreed price $150.00" minus "$100.-00 Ded.," with a balance due of $50.00; a check made payable to Palumbo in the amount of $50.00 signed by Melvin Bornstein on behalf of Whitehall; and a letter to insured Baugh directing him to pay his $100.00 deductible directly to Palumbo. Palumbo testified that he and Whitehall agreed on $150.00 to make that particular repair, and that he received $100.00 of that amount from the insured (the policy had $100.00 deductible) and $50.00 from Whitehall. The pattern was followed, generally, with respect to each count in the indictment.

There is ample proof to justify the jury in inferring that both Bornstein and Grossgold knowingly participated in the proven scheme to defraud. In addition to Palumbo's testimony as to the active participation of both Bornstein and Grossgold, there is the testimony of Pekin, another Whitehall employee who occasionally wrote letters regarding subrogation claims, that Bornstein told him that the reason the subrogation claims were inflated was to cover legal costs and handling expenses. And the record also contains a note written by Bornstein to Grossgold directing Grossgold to see if he could collect on another subrogation claim, and if he could, Whitehall would "pay and get subro agreement for better amount."

There is also evidence that Grossgold, who directly handled the subrogation claims, wrote a note to an uninsured motorist whose car had collided with that of a Whitehall insured, concerning arrangements for payment of a subrogation claim in the amount of $500.00. The top of the Whitehall file in that case reflected that total payments by Whitehall were only $350.00, and Grossgold admitted that he had written on the Whitehall file a notation of a conversation with the uninsured motorist. And the note from Bornstein and another note from Palumbo indicated that Grossgold was aware that Whitehall sent out inflated subrogation bills, even if Grossgold did not pursue the claims in those particular cases. There is substantial evidence that both Bornstein and Grossgold knew the subrogation claims were fraudulent.

In imprisoning Bornstein for two years, and merely fining Grossgold, the district court evidently had in mind the

pro rata fraudulent participation of defendants in the several offenses. The distinction between the defendants' guilt shown in sentencing, however, is no indication that the joint trial resulted in the jury's convicting Grossgold merely because of his association with Bornstein. Rather the sentences show the court's determination of the degree of guilt of each defendant.

## II.

■ The crimes charged in the indictment are alleged to have occurred between June 17, 1963 and December 4, 1963. Whitehall voluntarily turned over its books and records to the Illinois Department of Insurance at the end of 1963.[2] The Department alerted the postal authorities who in 1965 or 1966 began the investigation which led to the indictment. The investigation, involving over 140 files, ended on April 18, 1968. The indictment followed on June 18, and the jury returned its verdicts March 10, 1969.

During the investigation interviews were conducted of Whitehall's insureds and of persons insured by other companies. Hoffman, a claim adjuster for Whitehall, died in January, 1963. Zizzo, owner of one of the garages allegedly involved in the scheme, was interviewed in March, 1968, and died in October, 1968. Katz, another Whitehall adjuster, was interviewed in February, 1968, and died in November, 1968. The investigation ended and the report was given the United States Attorney in April, 1968.

Postal Inspector Potter who conducted the investigation filed an affidavit in support of the government's response to defendants' motion to dismiss the indictment for the delay. In this affidavit, Potter stated that Zizzo told him at the March, 1968 interview that he had, at Bornstein's request, "inflated bills" for repairs and either mailed or delivered them to Bornstein; and that Katz told

Potter at the February interview that he worked for Bornstein, that Bornstein and Grossgold took care of all the claim work and that Katz always turned over the work to Bornstein. No written statements were signed by Zizzo or Katz and neither testified before the grand jury.

Both defendants contend that this delay between the time the offense was committed and the day the indictment was returned denied defendants the right to a speedy trial and to due process. Both defendants rely upon Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), and the prejudice resulting from the delay. Specifically, the prejudice relied upon is the death of Zizzo and Katz, and the destruction of part of Grossgold's records—all of which events occurred between 1965 and 1968.

We see no merit in the contention that the district court committed reversible error in denying the motion to dismiss. The statute of limitations would have run against the offenses if indictment was delayed four days longer. But this is not conclusive, United States v. Haggerty, 419 F.2d 1003 (7th Cir. 1969). See United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1965). It had not run when the indictment was filed, United States v. Panczko, 367 F.2d 737 (7th Cir. 1966), and while it is possible that a delay within the statute of limitations could be so unreasonable and prejudice so great that due process would be violated, United States v. Deloney, 389 F.2d 324 (7th Cir. 1968), this is not such a case.

The affidavit of Potter indicates that both Katz and Zizzo would have incriminated Bornstein if they were alive and had testified. Their death prior to trial was in effect prejudicial to the prosecution and not the defense. And Grossgold's indirect benefit from Zizzo's and Katz's statements that they dealt with Bornstein was minimal in view of the

---

2. The books and records were warehoused by the Department until a liquidator for Whitehall was appointed in 1965 and the records removed for examination by the Department.

ample testimony of Grossgold's main participation, through his work as attorney in preparation of the subrogation claims. Also, Hoffman's testimony would have been of no value to the defense since he died in January of 1963, a time prior to most of the activities alleged in the indictment. And we are unable to see how Grossgold's destruction of his records could prejudice him under the facts here.

Dickey v. Florida, *supra*, does not compel a decision here that the delay was a violation of defendant's right to a speedy trial. In *Dickey* there was an eight year delay between arrest and trial, during which Dickey continually demanded trial, and the prosecutor provided no good reason for rejecting the demands. Here there was a two year delay in discovery of the possible fraud and a three year delay during which the postal authorities examined 140 files and selected 29 files for further investigation. This delay is not unusual in a case which requires extensive investigation of documents. We cannot say that it constituted "[d]eliberate governmental delay designed to harm the accused" condemned in *Dickey*. This case is closer to United States v. Lee, 413 F.2d 910 (7th Cir. 1969). There we rejected a similar claim on the basis that testimony at the trial showed no prejudice and defendant was able to recall specific facts concerning the incident in question.

### III.

■ Each defendant also claims reversible error in the court's denial of each defendant's motion for severance. This ruling was made within the court's discretion. United States v. Echeles, 352 F.2d 892, 897 (7th Cir. 1965). We see no abuse of discretion. Implicit in each one's argument on this point is a claim of prejudice in being tried with the other—the culprit. Bornstein's defense was good faith reliance on attorney Grossgold who "had complete knowledge of the files." Grossgold's argument is that trial with Bornstein exposed him to a finding of guilt by asso-

ciation with Bornstein and Whitehall, since he was an attorney for Whitehall and tenant of the office space in the same building and relied upon bills prepared by Bornstein.

Mutual hostility between the defendants is evident. But that does not alone control the court's discretion on the severance motions. Dauer v. United States, 189 F.2d 343, 344 (10th Cir. 1951), cert. den., 342 U.S. 898, 72 S.Ct. 232, 96 L.Ed. 672. The district court was not required on the showings made to conclude that the respective asserted defenses precluded a fair trial to each. *See* United States v. Hutul, 416 F.2d 607, 620–621 (7th Cir. 1969). Although each sought to escape conviction by placing the guilt on the other, their defenses were actually compatible since both claimed ignorance of the transactions.

Defendants cite United States v. Echeles, 352 F.2d 892 (7th Cir. 1965), and Campbell v. United States, 122 U.S. App.D.C. 143, 352 F.2d 359 (1965). Those cases are distinguishable. In *Echeles*, a co-defendant made a statement which could have exculpated the defendant and this court ordered a severance. In *Campbell*, the evidence against one defendant was overwhelming and the evidence against the other insignificant. The court ruled that the defendants' trial should be severed because the person against whom the evidence was slight could be prejudiced by being tried with the other defendant. The showings made by the defendant in both those cases went far beyond a showing of hostility.

### IV.

■ Both Bornstein and Grossgold claim prejudice in denial of their motion for a continuance in order to obtain an additional attorney. They argue that representation by the same attorney prejudiced each. We see no merit in this point. The motions for separate trials were made November 23, 1968, and a 60 day continuance was sought to obtain an additional attorney. Although the motion was not granted, the trial be-

gan more than 60 days after the motion was made. There was ample time to obtain the attorney before trial to avoid what prejudice, if any, resulted from lack of an additional attorney.

For the reasons given, the judgment is affirmed.