(No. 46062.—

*In re* NATHAN GROSSGOLD, Attorney, Respondent.

*Opinion filed Sept. 17, 1974.—Rehearing denied Nov. 26, 1974.*

Robert S. Bailey, of Chicago, for respondent.

John F. McCarthy, of Chicago, for *amicus curiae* Board of Managers of the Chicago Bar Association.

MR. JUSTICE DAVIS delivered the opinion of the court:

This is a disciplinary proceeding against the respondent, Nathan Grossgold, under Supreme Court Rule 751 (Ill. Rev. Stat. 1967, ch. 110A, par. 751), wherein the sole meritorious issue is the measure of discipline to be imposed against the respondent.

The Committee of Inquiry of the Chicago Bar Association filed a complaint against Grossgold on May 19, 1969, alleging that he was "guilty of conduct which tends to bring the legal profession into disrepute and of conduct unbecoming a member of the legal profession." Hearings were had before the Committee on Grievances of the Chicago Bar Association sitting as Commissioners of this court, after which Division II of the Committee on Grievances recommended that the respondent be suspended for three years. The respondent filed objections thereto, and oral argument was had before the entire Committee on Grievances, which overruled the objections and recommended disbarment. Again objections were filed and

argument had before the Board of Managers of the Chicago Bar Association, which body approved the recommendation of disbarment.

The proceedings were brought in response to the respondent's conviction in the Federal District Court for the Northern District of Illinois on nine counts of mail fraud in violation of 18 U.S.C.A. sec. 1341. His conviction was affirmed on appeal in *United States v. Bornstein and Grossgold* (7th Cir. 1971), 447 F.2d 742, *cert. denied* (1971), 404 U.S. 851, 30 L. Ed. 2d 91, 92 S. Ct. 88.

In *In re Fumo* (1972), 52 Ill.2d 307, at page 309, this court stated:

"Prior decisions of this court have established that in disciplinary proceedings, conviction of a crime involving moral turpitude is conclusive evidence of an attorney's guilt and is a ground for disbarment (*In re Eaton* (1958), 14 Ill.2d 338, 340; *In re Teitelbaum* (1958), 13 Ill.2d 586, 588); and that violation of section 1341 of Title 18 of the United States Code (18 U.S.C.A. sec. 1341) is a crime involving moral turpitude. In the case of *In re Needham* (1936), 364 Ill. 65, at page 70, the court said: 'Attempting to obtain the money or property of others by fraud or false pretenses, whether through the use of the mails or otherwise, involves moral turpitude.' Also see: *In re Eaton* (1958), 14 Ill.2d 338. The respondent does not question the validity of these precedents, but contends that the recommendation that he be disbarred is too severe."

The respondent here is in the same position as the respondent in *In re Fumo*.

In *In re Hutul* (1973), 54 Ill.2d 209, at pages 214 and 215, this court quoted the following language from *In re Crane* (1961), 23 Ill.2d 398, 400-401, which, in consider-

ing the proper approach to such matters, stated:

" 'While the conviction is conclusive evidence of guilt, it does not preclude the consideration of other evidence for the purpose of determining the appropriate disciplinary action. After all, a respondent is being disciplined not because of his conviction but because of his conduct. The actual conduct itself is certainly relevant to a determination of the appropriate discipline to be accorded. Just as every conviction of a crime does not require the same punishment, so all convictions of crimes involving moral turpitude do not require the same discipline. Thus, a consideration of the actual conduct of the respondent is not only proper, but may be indispensable, to an informed appraisal of the appropriate disciplinary action.' "

We must look therefore to all of the circumstances surrounding the respondent's commission of the crime of mail fraud.

The respondent moved to Chicago from New York City in the summer of 1962. He had apparently been successfully engaged in the private practice of law in New York for a number of years, and came to Illinois in order to go into business with Melvin S. Bornstein, his brother-in-law, in starting an insurance company, and for the further reason of living closer to his wife's family. We think it is fair to say that the prospective insurance business was the controlling consideration.

The criminal proceedings in the Federal court reflect that Melvin S. Bornstein and Albert Rosenthal formed the Whitehall Insurance Company in 1961. In May of 1961 they acquired an inactive insurance company and proceeded to have it activated as the Whitehall Mutual Fire and Marine Insurance Company. It was upon the activation of this company that Bornstein persuaded the respondent to

come to Illinois. The respondent became claims manager of Whitehall in 1962.

In March, 1963, the respondent's employment with Whitehall ceased, and he operated as a private practitioner with offices in the Whitehall building, and handled subrogation claims for Whitehall against other insurance companies and uninsured motorists on a 25-percentage basis. In December, 1963, Whitehall ceased doing business and its assets and records were turned over to the Illinois State Bureau of Liquidations in November of 1964.

The degree of culpability of Bornstein and Grossgold became apparent in the evidence at the criminal trial. A distinction in the culpability of the defendants was recognized in their sentencing. The United States District Court imposed a two-year imprisonment sentence on Bornstein and imposed a fine on Grossgold.

The respondent's total profit from the fradulent acts consisted of legal fees in the sum of $586.76; the bulk of the fraudulently obtained funds inured to Whitehall Insurance Company.

The evidence which substantiates the charges was summarized by the Seventh Circuit Court of Appeals, 447 F.2d 742, 744, as follows:

"Defendants contend there is insufficient evidence to support the guilty verdicts. We see no reason to discuss in detail the abundant proof adduced at trial to sustain the verdict. The fraudulent scheme was shown by the testimony of Palumbo, one of the garage owners involved in the scheme, that either Bornstein or Grossgold would call him to make arrangements for repair of a damaged automobile covered by a Whitehall policy. After examining the car, Palumbo would make up a written estimate for the cost of repairs and convey it to Whitehall, and an agreement would be made between Palumbo and Bornstein or Grossgold to repair the automobile at a cost

lower than the estimate. The estimate, marked 'paid,' would then be sent to the insurer of the person whose car collided with that of Whitehall's insured, along with a subrogation claim written by Grossgold. Whitehall would then be paid the amount stated on the estimate.

This testimony was fully corroborated by Whitehall's files. For example, insured Baugh's file, used in proof of Count V, contains an estimate on Palumbo's stationery in the amount of $190.25, marked 'paid;' a cover letter written by Grossgold to Economy Fire and Casualty Co., insurer of the driver of the other automobile involved in the Baugh collision, referring to 'the paid repair bill in the amount of $190.25' which was sent with the letter; and a check from Economy in the amount of $190.25 made payable to Baugh and/or Grossgold. The file also shows a bill from Palumbo for 'agreed price $150.00' minus '$100.00 Ded.,' with a balance due of $50.00; a check made payable to Palumbo in the amount of $50.00 signed by Melvin Bornstein on behalf of Whitehall; and a letter to insured Baugh directing him to pay his $100.00 deductible directly to Palumbo. Palumbo testified that he and Whitehall agreed on $150.00 to make that particular repair, and that he received $100.00 of that amount from the insured (the policy had $100.00 deductible) and $50.00 from Whitehall. The pattern was followed, generally, with respect to each count in the indictment.

There is ample proof to justify the jury in inferring that both Bornstein and Grossgold knowingly participated in the proven scheme to defraud. In addition to Palumbo's testimony as to the active participation of both Bornstein and Grossgold, there is the testimony of Pekin,

14

another Whitehall employee who occasionally wrote letters regarding subrogation claims, that Bornstein told him that the reason the subrogation claims were inflated was to cover legal costs and handling expenses. And the record also contains a note written by Bornstein to Grossgold directing Grossgold to see if he could collect on another subrogation claim, and if he could, Whitehall would 'pay and get subro agreement for better amount.'

There is also evidence that Grossgold, who directly handled the subrogation claims, wrote a note to an uninsured motorist whose car had collided with that of a Whitehall insured, concerning arrangements for payment of a subrogation claim in the amount of $500.00. The top of the Whitehall file in that case reflected that total payments by Whitehall were only $350.00, and Grossgold admitted that he had written on the Whitehall file a notation of a conversation with the uninsured motorist. And the note from Bornstein and another note from Palumbo indicated that Grossgold was aware that Whitehall sent out inflated subrogation bills, even if Grossgold did not pursue the claims in those particular cases. There is substantial evidence that both Bornstein and Grossgold knew the subrogation claims were fraudulent."

In light of the recent decisions of this court in *In re Hutul* and *In re Fumo,* the only remaining question is whether the factual circumstances of the instant situation differ sufficiently from those in the aforesaid cases to justify a penalty less drastic than disbarment.

Although the fraud was accomplished by the respondent through his role as an attorney, it is apparent that the driving force behind the fraudulent scheme and the man chiefly responsible for it was Bornstein. The actions of this

respondent, while certainly requiring discipline, are not of the same degree of culpability as was present in *Hutul* and *Fumo.*

This is the only stain on the respondent's legal record in 30 years of practice, but this conduct did tend to bring the legal profession into disrepute, was unbecoming to the respondent, as a member of the profession, and does warrant some sanction against the wrongdoer. However, in view of his past unblemished prior record, and his minor role in the fraudulent scheme, we believe the objectives of disciplinary proceedings in this case are adequately served by the respondent's suspension from practice for a period of three years, and it is so ordered. Such sanction will tend to protect the public from improprieties by members of the bar and will assist in upholding the integrity of the bar.

*Respondent suspended.*