HALDANE, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–197–CR. Submitted on briefs September 7, 1978.—*
*Decided October 3, 1978.*
(Also reported in 270 N.W.2d 75.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Mark Lukoff,* assistant state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Nadim Sahar,* assistant attorney general.

DAY, J.    Chance L. Haldane, plaintiff in error (here-after "defendant") was convicted following a jury trial

of armed robbery, and concealed identity, contrary to secs. 943.32(1)(b),[1] and (2), and 946.62, Stats.[2] 1975. A judgment of conviction was entered on December 8, 1975 by the circuit court for Washington county. Defendant was sentenced to an indeterminate term of not more than eighteen years in the Wisconsin State Prison on the armed robbery charge, and a concurrent three year term for the concealed identity charge. Motions for a new trial were heard on July 1, 1976, and denied on September 11, 1976. Writs of error were then issued to review the judgment of conviction and the order denying a new trial.

The question is did the trial court abuse its discretion in denying defendant's motion to sever his trial from that of a codefendant. We hold that there was no abuse of discretion and accordingly affirm the judgment of conviction and the order denying a new trial.

The defendant was convicted for his role in the September 15, 1975 robbery of the State Bank of Slinger, Wisconsin. Before the trial, the state filed a motion to join the defendant's case with that of a woman (hereafter codefendant) charged with participation in the same robbery. The court granted the state's motion noting that if the defendants advanced conflicting defenses at trial, it could determine after the evidence had been presented

---

[1] "943.32. **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years: . . . (b) By threatening the imminent use of force against the person or of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property . . ."

[2] "946.62. **Concealing Identity.** Whoever commits a crime while his usual appearance has been concealed, disguised or altered, with intent to make it less likely that he will be identified with the crime, may in addition to the maximum punishment fixed for such crime, in case of conviction for a misdemeanor be imprisoned not to exceed one year in county jail, and in case of conviction for a felony be imprisoned not to exceed 5 years."

whether a cautionary instruction to the jury or severance was necessary to cure any prejudice.

At the trial, the state put in its evidence against the defendant and codefendant. The defendant did not put in any evidece. The codefendant testified in her own behalf. The defendant was convicted on the charge of armed robbery and concealed identity. The codefendant was found not guilty of being a party to the crime of armed robbery and concealed identity.

Only the defendant and the woman codefendant were on trial. Two other men were involved; John Winget, the defendant's brother, was granted immunity for testifying in the trial as to his part in the robbery and James Tyo had previously pled guilty and was awaiting sentence on charges involving his part in the crime.

The evidence showed that the State Bank of Slinger was robbed on September 15, 1975 by two disguised men carrying handguns. The men were the defendant Haldane and James Tyo. Tyo ordered the bank personnel into the back room while the defendant held a gun on the tellers in the lobby and ordered a teller to place money in a pillow case. The two men took the keys to the bank cashier's car, left the bank in that car and drove to the outskirts of Slinger where the defendant had previously concealed his van.

James Tyo testified that on September 15, 1975, he went to the apartment of the defendant in West Bend where he met the defendant, the codefendant and the defendant's brother John Winget. Tyo and the defendant went to an upper room where they put on wigs and beards. Defendant and Tyo got into the defendant's volkswagen van and the defendant did the driving. Winget and the female codefendant were in another vehicle. The defendant parked the van on the outskirts of Slinger and the two men got into Winget's car, drove into Slinger and parked near the bank. Tyo and the defendant

walked into the bank, each carrying a .22 caliber automatic handgun. They drew their guns and moved the people to the back room. The defendant went to the vault and returned with a bag of money. The two then drove to a spot where the van was parked and they changed clothes. Later, defendant and codefendant went to Fond du Lac to a city park where the money was divided between Tyo and the defendant. It was Tyo's testimony that he had not expected the codefendant to go along on the robbery, that she refused to accept any money from the robbery and that she was not involved in the planning.

John Winget testified that he saw the codefendant aid the defendant and Tyo with their disguises prior to the robbery, although he had testified to the very opposite at the preliminary hearing. The state rested its case. The defendant, Haldane, produced no evidence and rested his case. The codefendant testified in her own behalf stating that on September 15, 1975 she was living with the defendant and her seven year old son in West Bend. She testified that John Winget moved in with them in July, 1975. About a month before the robbery, she heard the defendant and Tyo discussing it on the telephone. On September 9, 1975, she was with the defendant in Fond du Lac when he picked out a pistol and a rifle for which she paid. On September 10 or 11, 1975, the defendant bought another pistol for which she paid. The defendant and Tyo and the codefendant also went to Milwaukee where the two men bought wigs, beards and mustaches prior to the robbery. She testified that on September 15, 1975, Tyo came to the house and went upstairs with the defendant and the two men put on wigs, beards and mustaches. She testified she did not aid the defendant in any manner nor help him or Tyo with the disguises. She testified that the defendant told her that she had to go along with him or he would tell the Department of

Social Services that she was an unfit mother. She said she refused but that he told her he would get other witnesses as to her unfitness, and so she went along. Her testimony was that she had tried several times prior to the robbery to talk the defendant out of going through with the robbery, and had told him that he could not possibly get away with it.

She drove into Slinger on the day of the robbery with Winget and when they saw a green car hurrying past them at a high rate of speed, she then suggested that they go home, which they did. Later, she went with the defendant to Fond du Lac because he told her that she had to go. When the money was divided between the defendant and Tyo, she refused to take any. In Fond du Lac she bought three money orders for the defendant and he purchased three in the same bank and she said she did so after he reminded her of the conversation in the morning concerning the Department of Social Services. On cross-examination, she admitted that the defendant never threatened her or her son with any physical harm and that she only went with him because of his threats to talk to the Department of Social Services. The defense also recalled James Tyo to the stand and he testified that the codefendent was not present when he and the defendant discussed the robbery nor was she supposed to go along on the robbery.

The state had put in other testimony including an in court identification of the defendant Haldane as one of the bank robbers made by a cashier at the bank and by the executive vice president of the bank. A detective testified that he located a box containing $22,500 in the attic of the apartment in West Bend where the defendant lived and the landlady testified that the codefendant had rented the apartment on August 1, 1975 and that the defendant and Winget were also present. She also testi-

fied that only the tenants had access to the attic in the building.

The defendant's counsel first moved for a severance or a separate trial for his client, prior to the commencement of the trial. But at that time, the court had nothing on which to base an order for severance since the codefendant had merely informed the court that she would testify on her own behalf but did not specify what her testimony would be nor did the codefendant's counsel in his motion for severance make any statements as to what he thought her testimony would be that would require separate trials.

The defendant argues that the trial court's refusal to sever his trial from that of his codefendant prejudiced him in two ways: (1) His codefendant's "coercion" defense was antagonistic to his own defense, and therefore he was entitled to a separate trial, and (2) his codefendant's reference to his prior imprisonment prejudiced his defense.

The joinder and severance of defendants in a criminal case is governed by sec. 971.12(2), (3), and (4), Stats.[3]

[3] "971.12 **Joinder Of Crimes And Of Defendants. . . .** (2) JOINDER OF DEFENDANTS. Two or more defendants may be charged in the same complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting one or more crimes. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

"(3) RELIEF FROM PREJUDICIAL JOINDER. If it appears that a defendant or the state is prejudiced by a joinder of crimes or of defendants in a complaint, information or indictment or by such joinder for trial together, the court may order separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. The district attorney shall advise the court prior to trial if he intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge shall grant a severance as to any such defendant.

"(4) TRIAL TOGETHER OF SEPARATE CHARGES. The court may order

A trial court has power to try defendants together when they are charged with the same offenses arising out of the same transaction and provable by the same evidence. *Jung v. State,* 32 Wis.2d 541, 545, 145 N.W.2d 684 (1966) ; *State v. DiMaggio,* 49 Wis.2d 565, 576, 182 N.W.2d 466 (1971). Generally, questions of consolidation or severance are within the trial court's discretion, *State v. Doyle,* 40 Wis.2d 461, 469, 162 N.W.2d 60 (1968) ; *Lampkins v. State,* 51 Wis.2d 564, 572, 187 N.W. 2d 164 (1971). On review, the decision of the trial court will not be disturbed unless there has been an abuse of discretion. *Kluck v. State,* 223 Wis. 381, 387–388, 269 N.W. 683 (1937). As this court stated, in *Lampkins v. State, supra* at 572:

"Consolidation is a procedural mechanism which avoids repetitious litigation and facilitates the speedy administration of justice."

Nevertheless, there may be "circumstances where a joint trial would be unduly prejudicial to the interests of either or both of the defendants; and in that case the interests of administrative efficiency must yield to the mandates of due process. Such circumstances are found where the defendants intend to advance conflicting or antagonistic defenses." *Id.* at 572. Severance may also be granted where there is danger that an entire line of evidence relevant to the liability of only one defendant may be treated as evidence against all defendants by the trier of fact simply because they are tried jointly, *State v. Nutley,* 24 Wis.2d 527, 543, 129 N.W.2d 155 (1964).

2 or more complaints, informations or indictments to be tried together if the crimes and the defendants, if there is more than one, could have been joined in a single complaint, information or indictment. The procedure shall be the same as if the prosecution were under such single complaint, information or indictment."

Here the defendant argues only antagonistic defenses as grounds for severance.

This court has stated in the past that "when antagonistic defenses are asserted by codefendants, the demands of a fair trial require that the cases be tried separately because the defendant should not be forced to face the double burden of having to meet the attack both of the prosecutor and of his codefendant." *Jung v. State, supra* at 546. Further analysis, however, reveals that this court has been slow to find grounds for reversal on this basis. Broad assertions that the defenses of codefendants may conflict have been found inadequate. In *Jung,* the court stated that the trial court's order consolidating the trial of codefendants "must be viewed in light of the facts presented to it at the time the objection was made to the consolidation. The objection was in general terms, stated no reasons and did not indicate the testimony of [the codefendants] which might be prejudicial to Jung." *Jung v. State, supra* at 546, 547. Thus, where the defendant failed to allege antagonism with sufficient specificity, the court found no abuse of discretion in allowing consolidation.

This court also found no basis for severance on the ground of conflicting defenses, where none of the defendants took the stand in his own defense. *Lampkins v. State, supra* at 572, or where the allegedly conflicting testimony of a codefendant was merely cumulative to evidence given by the state's witnesses, *State v. Shears,* 68 Wis.2d 217, 229 N.W.2d 103 (1975), discussed *infra.*

In *United States v. Kahn,* 381 F.2d 824 (7th Cir. 1967), Kahn, Sachs, and Curran were convicted as conspirators in a scheme to illegally use moneys of a number of federally insured banks and savings associations for their personal benefit. Each defendant attempted to exonerate himself by throwing the blame on one or more codefend-

ants. Sachs and Curran tried to portray themselves as the innocent and naive agents of the mastermind Kahn. Meanwhile, Kahn tried to show that he acted in apparent good faith, with the advice of and in conjunction with responsible and reputable individuals. While the court concluded that the defense of Sachs and Curran was inconsistent with that of Kahn, it added that it was not clear that Kahn could not have been found innocent if Sachs and Curran were so found. *Kahn, supra* at 841.

Similarly, in *United States v. Bornstein,* 447 F.2d 742 (7th Cir. 1971), the codefendants in a scheme to defraud tried to defend themselves by inculpating each other. Again, the court found no abuse of discretion in denying motions to sever, commenting:

"Mutual hostility between the defendants is evident. But that does not alone control the court's discretion on the severance motions. The district court was not required on the showing made to conclude that the respective asserted defenses precluded a fair trial to each. Although each sought to escape conviction by placing the guilt on the other, their defenses were actually compatible since both claimed ignorance of the transactions." *United States v. Bornstein, supra* at 746.

In *State v. Nutley, supra,* the defendants were convicted in the murder and attempted murder of two police officers. The court said that there was no abuse of discretion in the trial court's refusal to grant the defendants separate trials because their defenses did not, in fact, conflict.

The court stated:

"In the context of this case, the defendants would have asserted antagonistic defenses if each had asserted that he had not joined the conspiracy formed by the others, or had remained passive (or even resisted) while the others executed the crimes in question. However, in fact, the defendants maintained equivalent defenses. Each denied any conspiracy and claimed in effect that

Jantz and Kohl [the police officers] shot each other during a general melee instigated by the officers. The liability of each depended upon . . . a single defense version of the events in issue." *State v. Nutley, supra* at 543.

In *Irby v. State,* 49 Wis.2d 612, 182 N.W.2d 251 (1971), two brothers, Leon and Sampson Irby were jointly tried for stabbing a bartender, Charles Harris. Sampson testified that he had not stabbed anyone. Leon testified that he stabbed Harris outside the tavern in self-defense. There was testimony establishing that Harris was stabbed once by Sampson inside the tavern, and several times by Leon outside the tavern. On appeal, Leon Irby asserted that he should have had a separate trial because his defense conflicted with that of his brother. This court disagreed, however, because there was no testimony that Leon had stabbed Harris *inside* the tavern. Thus, Sampson's denial that he stabbed Harris was not prejudicial to Leon because it did not preclude Leon's claim that he was acting in self-defense when he stabbed Harris *outside* the tavern. Had Leon been accused of stabbing Harris inside the tavern, his defense would have conflicted with that of his brother. In such a case, if the jury had believed Sampson, it would have been forced to convict Leon, given a situation in which either one or the other of the brothers committed the act.

*State v. Shears, supra,* was a case in which several defendants were jointly tried for murder and armed robbery. At trial, one defendant Ford testified at trial, claiming that he withdrew from the conspiracy to rob Harold's Club, a Madison bar and restaurant. His testimony, for the most part, corroborated that of the state's witnesses establishing the conspiracy. The court concluded that the trial court did not err in refusing his codefendants' motions for severance for two reasons. The court doubted whether Ford's testimony constituted a de-

fense at all since there was ample evidence to establish that the robbery and murder had been committed before Ford's alleged physical withdrawal from the scene. Furthermore, Ford's testimony was merely cumulative to that of the state's witnesses. Partial corroboration of government testimony by a codefendant was held not to constitute grounds for severance.

In the instant case, Haldane put on no defense, in effect, asserting that the state had failed to show that he robbed the bank. The codefendant put on a coercion defense—that is, she admitted being in the car with Haldane, Winget and Tyo, as well as a number of other incriminating acts both before and after the actual robbery at the bank. But she maintained that she only went along because of Haldane's threats. Her defense was antagonistic to Haldane to the point of mutual exclusion. To believe that she was coerced, it is logically necessary that Haldane was there to do the coercing.

However, although grounds existed for which the court in the exercise of its discretion could have granted a severance, her testimony was merely cumulative to that of James Tyo, Winget and other prosecution witnesses. Thus, the trial court did not abuse its discretion in denying the motions for severance. *State v. Shears, supra* at 237. The question must be looked at in the context of the entire trial and the relative importance of her testimony to the state's case. Her testimony merely corroborated overwhelming testimony by the state's witnesses, including that of one who had already pled guilty to the crime in question and another who had been granted immunity from prosecution in connection with the same crime.

It requires more than mere antagonistic testimony by a codefendant to make refusal of a motion for severance reversible error. If the state presented a weak case against a defendant and the codefendant's testimony

really turned out to be the principal and the most substantial evidence that convicted a defendant, then the case for severance following such testimony would be much stronger. But where a codefendant's testimony follows testimony as overwhelmingly against the defendant as that presented by the state here, refusal to grant a severance is not an abuse of discretion.

Even if she had not testified, there was more than ample evidence to convict Haldane. Tyo, who had entered a plea of guilty to the robbery, testified that on the morning of September 15, he and Haldane put on wigs and beards, that they had left together in Haldane's van while Winget and the codefendant left in Winget's car, that he and Haldane parked the van on a dirt road outside Slinger, and drove to Slinger in Winget's car, that he and Haldane had drawn their guns in the bank and taken a bag of money from the vault, that they had driven away in a car belonging to one of the bank employees, that they changed clothes in the van and returned to Haldane's apartment, that they had divided the money later that day in Fond du Lac. Winget's testimony corroborated that of Tyo except that he was unable to testify as to what happened inside the bank. In addition, two eye witnesses identified Haldane as one of the robbers.

We conclude there was no error in the trial court's refusal to grant Haldane's motion for severance.

The defendant also asserts that he was prejudiced by Tyo's and the codefendant's references to his prior prison term. The assertion is made in the context of defendant's claim that severance was required because of codefendant's antagonistic defense. But these references had no connection to any defense theory advanced by the codefendant. The argument presents no support for severance. Any other prejudice which may have resulted from references to defendant's prior imprisonment was

cured by the judge's instruction to the jury to ignore such references. There is no claim in defendant's brief that these remarks resulted in prejudicial error apart from adding to the argument for severance. We find no prejudicial error.

In addition to the brief filed in defendant's behalf by the State Public Defender, which argued the issues discussed above, the defendant also filed a "supplemental brief" *pro se*. In his *pro se* brief defendant argues that he was subjected to "double jeopardy" because he was punished for the crime of armed robbery under sec. 943.32(1)(b) and (2), and also for committing a crime while his identity was concealed under sec. 946.62, Stats. In addition, the defendant attempts to attack the constitutionality of the robbery statute. However, this argument seems to be but another version of the double jeopardy argument.

This court in *State v. Ramirez*, 83 Wis.2d 150, 154, 265 N.W.2d 274 (1978), reaffirmed its adherence to the "same evidence" test of double jeopardy articulated recently by the United States Supreme Court in *Brown v. Ohio*, 432 U.S. 161, 97 S. Ct. 2221, 2225:

"The established test for determining whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment was stated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932):

" 'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. . . .'

"This test emphasizes the elements of the two crimes. 'If each requires proof that the other does not, the *Blockburger* test would be satisfied, notwithstanding a substantial overlap in the proof offered to establish the

crimes. . . .' *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S. Ct. 1284, 1294, 43 L. Ed.2d 616 (1975)."

"The Wisconsin test, which requires that the offenses be the same in law and in fact, is a form of the 'same evidence rule.' *State v. Van Meter,* 72 Wis.2d 754, 757, 758, 242 N.W.2d 206 (1976) ; *State v. George,* 69 Wis.2d 92, 230 N.W.2d 253 (1975). Sec. 939.71, Stats., codifies this rule." *State v. Ramirez, supra* at 154.

Sec. 939.71, Stats. 1975 provides:

"**Limitation On The Number Of Convictions.** If an act forms the basis for a crime punishable under more than one statutory provision of this state or under a statutory provision of this state and the laws of another jurisdiction, a conviction or acquittal on the merits under one provision bars a subsequent prosecution under the other provision unless each provision requires proof of a fact for conviction which the other does not require."

The Double Jeopardy Clause protects against multiple punishments for the same offense, as well as successive prosecutions for the same offense, *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969) ; *Brown v. Ohio, supra,* 97 S. Ct. at 2225.

In the case at bar the defendant was sentenced to an indeterminate term of not more than eighteen years on the armed robbery charge, and a concurrent three year term for concealed identity. Sec. 943.32 provides that anyone convicted of armed robbery may be imprisoned for not more than thirty years; sec. 946.62 provides that any one who commits a crime while his identity is concealed may in addition to the maximum punishment fixed for the crime, be sentenced to an additional five years in the case of a felony.[4] While sec. 946.62 on concealment

---

[4] Effective June 1, 1978, those statutes were amended to make armed robbery under 943.32(1)(b) and (2) a Class B felony, and

of identity is a separate statute, its application merely makes it an aggravating factor of the underlying crime. In the case at bar, the court submitted three possible verdicts: one was guilty of armed robbery, the second was guilty of armed robbery while identity was concealed and the third form of verdict was not guilty. The court made it very clear in its instructions that in order to find the defendant guilty of armed robbery while identity was concealed, the jury must first find the defendant guilty of armed robbery. It stands in the same relation to robbery as the difference between armed robbery and robbery. Armed robbery is an aggravated form of robbery; armed robbery while identity is concealed is an aggravated form of armed robbery. The legislature could have provided extra punishment for each and every crime in the statutes by adding a concealment of identity subsection to every section of the criminal code. However, the legislature followed the very logical path of making concealment an aggravation of any crime by enacting sec. 946.62. There is no offense to the double jeopardy clause of the constitution in either the statutory structure or the manner in which it was applied in this case.

The defendant's second argument is without merit. It contends that he is being forced to defend against charges of both robbery and armed robbery. This is not true. The charge is under 943.32(1)(b) and (2). Sub. (2) qualifies sub. (1); it is not a separate charge.

*By the Court.*—Judgment and order affirmed.

concealment while committing a felony a Class D felony under 946.62, Stats. See sec. 939.50, Stats. for felony classifications.