# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP2686-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |       Plaintiff-Respondent-Petitioner, |
| |    v. |
| | Luis C. Salinas, |
| |       Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 362 Wis. 2d 538, 865 N.W.2d 88
(Ct. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | May 26, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 20, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Brown |
|   JUDGE: | Marc A. Hammer |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | ABRAHAMSON and BRADLEY, A. W., JJ. dissent (Opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, the cause was argued by *Katherine D. Lloyd*, assistant attorney general, which whom on the briefs was *Brad D. Schimel*, attorney general.

For the defendant-appellant, there were briefs by *Steven D. Grunder*, assistant state public defender, and oral arguments by *Steve D. Grunder*.

**2016 WI 44**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP2686-CR
(L.C. No. 2010CF542)

STATE OF WISCONSIN                    :          IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

    **v.**

**Luis C. Salinas,**

    **Defendant-Appellant.**

**FILED**

**MAY 26, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA G. BRADLEY, J. In this appeal, we are asked to determine whether the Brown County Circuit Court erred when it granted the State's motion to join intimidation charges involving two victims, a mother and her daughter, with already-pending sexual assault charges where the daughter was the victim. The circuit court[1] held that joinder was proper under

---

[1] The Honorable Mark A. Warpinski made the initial joinder decision; however, he recused himself on November 9, 2011. Ultimately, the Honorable Marc A. Hammer presided.

Wis. Stat. § 971.12(1)(2009-10);[2] the court of appeals reversed in an unpublished per curiam opinion.[3]

¶2 We hold that joinder was proper because the charges joined were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan," the charges were "connected together," and the charges constituted parts of a "common scheme or plan." See Wis. Stat. § 971.12(1). Accordingly, we reverse the court of appeals and affirm the jury's verdicts finding Luis Salinas guilty of: (1) repeated sexual assault of a child; (2) second-degree sexual assault; (3) second-degree sexual assault of a child under the age of 16; (4) intimidation of witness, M.S.; and (5) intimidation of witness, V.G.

### I. BACKGROUND

¶3 Salinas lived with his girlfriend M.S., their son A.S., M.S.'s daughter V.G., and M.S.'s two sons. On October 26, 2009, police were called to the family home following a domestic violence incident. V.G. reported that Salinas slapped her face after M.S. left for work, and when M.S. returned home, V.G. heard M.S. and Salinas arguing. V.G. said she saw Salinas with both hands on M.S.'s neck in what looked like an attempt to choke M.S. to death. V.G. yelled at Salinas to let M.S. go.

---

[2] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

[3] See State v. Salinas, No. 2013AP2686-CR, unpublished slip op. (Wis. Ct. App. Apr. 21, 2015)(per curiam).

M.S. yelled for V.G. to get out of the house and call police. M.S. reported she grabbed Salinas's hair, escaped his grasp, and ran out of the house. When M.S. looked back, Salinas had their then four-year-old son, A.S., in the doorway and Salinas had a knife in one hand although the knife was not pointed at A.S. Salinas told A.S. to ask M.S. to come back inside. Salinas yelled for V.G. not to call police or Salinas would kill A.S. and kill himself. Police arrived shortly thereafter and arrested Salinas.

¶4  The next day, October 27, 2009, the State charged Salinas with four counts arising from this domestic violence incident. Both M.S. and V.G. were domestic violence victims. Salinas entered into a plea agreement with the State. On March 8, 2010, Salinas entered Alford[4] pleas to domestic violence strangulation and suffocation and domestic violence battery. The other two counts were dismissed but read in at sentencing.

¶5  While the domestic violence charges were pending, Salinas frequently called M.S. from jail. Between the time Salinas was arrested and the date of his sentencing in the domestic violence case on May 11, 2010, the jail recorded over 500 phone calls from Salinas to M.S. The intimidation charges

---

[4] "An Alford plea is a guilty plea where a defendant pleads guilty to a charge but either protests his innocence or does not admit to having committed the crime. The plea derives its name from the United States Supreme Court's decision in North Carolina v. Alford, 400 U.S. 25 (1970)." State v. Garcia, 192 Wis. 2d 845, 851 n.1, 532 N.W.2d 111 (1995).

at issue here stem from those phone calls. The State asserted that transcripts from the phone calls show Salinas's attempt to pressure M.S. to change her statement to police about the domestic violence incident and come to the sentencing to help him look good with the sentencing judge.

¶6 In two of the calls, Salinas said:

I thank you so much for having my son, [M.S.] But you really piss me off. You don't know what I'm able to do. You don't know what I have done or what I could do. You are treating me like a piece of shit. No, my darling, you don't know who I am. That is why you want to send me to prison and you want me to go to hell. Fourteen years and six years for this and that and you think you're playing with a piece of shit. I told you long time ago don't call the cops on me because we're going – because they are going to take me seriously. And, look, you called the cops and all because of [V.G.].

I'm telling you, man, I can never talk to you because, look, you better start thinking that one day I'm coming out. Daughter of your fucking mother, because you're making me tired of always trying to kiss your ass. You better straighten your stinking, your fucking stinky ass. I'm so fucking sick of it. And then they don't want me to kick your ass, man. If you hate me so much, why don't you let me fuck myself up? You never have the mouth when I was outside. I know you're fucking mouthy. I'm tired of your shit. If I get out, if I get out, you are going to be sorry, my darling. You better answer me right now and tell me what is it that you want to do. I don't want to be mean to you because you're the mother of my son.

¶7 The State also asserted that Salinas pressured M.S. to convince V.G. to do something to help him with the sentencing judge. Salinas spoke with V.G. directly on one occasion. Ultimately, both M.S. and V.G. testified at Salinas's sentencing hearing on the domestic violence convictions. Both indicated to

4

the sentencing judge that they wanted Salinas to come back home. The sentencing court imposed three years of probation with nine months of jail time.

¶8 On May 13, 2010, two days after Salinas's sentencing on the domestic violence convictions, V.G. told her boyfriend, E.D., that Salinas had been sexually assaulting her for the past three years. According to E.D., V.G. was scared and shaky when she revealed the sexual assaults and her story came out in "bits and pieces." E.D. told V.G. to tell her mom and the police. V.G. then told M.S. and M.S. took V.G. to the police station to report what had happened.

¶9 V.G. told police that when she turned 13, Salinas began forcing her to have sexual intercourse. The first time was in the bathroom at their home on Oakland Street. Salinas told her to lie down on the bathroom floor. He took down her sweatpants and underwear and put his penis into her vagina. When she said no, he told her that if she refused, he would take her little brother away or send her away. He also hit her, punched her, and slapped her to force compliance. V.G. told police the sexual assaults took place 6 to 12 times a month over the course of three years. She said Salinas did this when her mother was not home. V.G. said the assaults occurred in the living room and Salinas's bedroom and the assaults continued when they moved to a different house on Dousman Street. V.G. explained that Salinas rarely used a condom, but did not ejaculate inside of her. He "pulled out" and then used a white rag, which he often made her wash afterwards.

5

¶10 V.G. told police that the last sexual assault occurred the day Salinas was arrested for the domestic violence. Salinas slapped her that day because she told him she did not want to have sex with him. V.G. reported that she did not tell anyone about the sexual assaults because she was afraid and ashamed and because Salinas repeatedly threatened that he would take her little brother away or send her away.

¶11 On May 19, 2010, the State charged Salinas with three counts related to the sexual assaults: (1) repeated sexual assault of a child in violation of Wis. Stat. § 948.01(1)-(2) and Wis. Stat. § 948.025(1)(b); (2) second-degree sexual assault in violation of Wis. Stat. § 940.225(2)(a); and (3) second-degree sexual assault of a child under the age of 16 in violation of Wis. Stat. § 948.02(2). Salinas pled not guilty and denied ever sexually assaulting V.G.

¶12 In August and September of 2010, the police listened to and translated from Spanish all the recorded telephone calls between Salinas and M.S. that Salinas made from jail. Both M.S. and Salinas spoke in Spanish. Police also interviewed M.S. and V.G. about all the telephone calls.

¶13 On October 5, 2010, the State charged Salinas with two counts of misdemeanor intimidation of a witness, in violation of Wis. Stat. § 940.44(1), and Wis. Stat. § 968.075(1)(a). One count listed M.S. as the victim and the second count listed V.G. as the victim.

¶14 On October 18, 2010, the State filed a motion to join the intimidation counts with the already-pending sexual assault

6

counts. The State argued the charges shared common victims and arose within six months of one another; moreover, the State argued for joinder because the evidence in the two cases overlapped, and if the cases were joined, the victims would only have to testify at one trial. Salinas argued the charges should not be joined because the intimidation charges related to the domestic violence case, not the sexual assault case. The circuit court joined the cases reasoning:

- One of the intimidation counts involves the same victim of the sexual assaults——V.G.——making it logical to "connect those two for purposes of trial."

- Joining the two cases will not confuse the jury.

- "There is a strong likelihood that all of this evidence in this file would come in under other-acts evidence."

¶15 After the circuit court's ruling, the State amended the Information to include the three sexual assault counts and the two intimidation counts. At the pre-trial conference on March 2, 2012, Salinas's lawyer indicated that Salinas would plead guilty on the intimidation counts but go to trial on the sexual assault counts. The State advised that even if the intimidation counts were pled out, it intended to present evidence on the intimidation charges in the sexual assault trial because

> it all ties together and that's why they were all joined. It starts with a domestic violence situation between the victim's mother and the defendant and evolves until we get to the disclosure in this case, and so I just want to be clear that [the] State

7

intends to put all that evidence forward because that's our case.

¶16 Salinas's lawyer responded that the intimidation charges arose from Salinas "trying to get them to consider a better sentencing recommendation" in the domestic violence case and "were completely separate from any sort of sexual assault allegation." The State explained "the last sexual assault occurred on the day [Salinas] went to jail for this strangulation. So that evidence is coming forward. [V.G.] knows it's that date because that's the date he strangled her mother and he went to jail and he was not able to assault her any further." The State argued that this evidence would be relevant to explain why V.G. delayed reporting the sexual assaults, and, in essence, to provide context. The circuit court cautioned Salinas's lawyer that pleading to the intimidation counts may not keep the evidence of the domestic violence incident out of the sexual assault trial——that it could come in as other acts evidence. The circuit court advised that the lawyer should "do with that what you want, and if you want to plea him, I'll take it on Tuesday" but "[w]hat I don't want is for you to enter a plea with a belief you got some type of commitment from the DA's Office or you're able to forecast what I'm going to do because that would be wrong." Salinas decided not to enter pleas to the intimidation counts and the joined charges were tried to a jury on March 6-7, 2012. At no time did Salinas file a motion seeking severance of the joined charges.

8

¶17 During the State's opening statement, the prosecutor told the jury the evidence would show a "pattern of violence, intimidation, threats, and most disturbingly, [that] repeated sexual assault of a child occurred to the victim, [V.G.], occurred within a family environment where her mother, [M.S.], was also a victim, where she had three younger brothers in that household as well." The prosecutor also explained that "this story begins . . . October 26, 2009" the day Salinas was arrested for domestic violence——for hitting V.G. and attempting to strangle M.S.:

> That is the day ladies and gentlemen, that the defendant strangled [M.S.], that he did that in front of [V.G.], that in the kitchen she was struggling to get away from him, that she yelled to [V.G.] to get out, call the police, that she was able to get away from the defendant, that she ran out herself, and when she turned around, what did she see? More violence and intimidation. She saw the defendant standing with his 4-year-old-son, [A.S.], to one side and a knife to the other telling [A.S.], "Tell your mother to come back inside."
>
> That is a day of horror but that is also a day that stopped what was happening to [V.G.] That is a day that family got help. That is the day that [V.G.] stopped being assaulted from the defendant. And we also know that day is the last day he assaulted her.

¶18 In Salinas's opening, his lawyer told the jury:

- "Just because he might be a bad guy is really irrelevant."

- The intimidation counts relate to a prior conviction for hitting M.S. and V.G. The intimidation is not "about a sexual assault."

9

- "I hope that you can parse out the difference between Mr. Salinas having a jaded past, perhaps having done a bad thing to these two people who are going to testify and whether the charges that he's here for today actually happened or not. They're very separate and distinguishable[.]"

¶19 The State's main witnesses included victims V.G. and M.S. V.G. testified:

- Salinas started sexually assaulting her when she turned 13 years old. The assaults occurred when her mother was not home and when her brothers were asleep or outside.

- The first assault was on the bathroom floor; other times Salinas assaulted her in the living room where he was careful to watch out the window for M.S. to make sure he did not get caught. He also assaulted her in the bedroom.

- He used a condom on only two occasions that she can remember; typically he would pull out before he ejaculated and finish with a white rag, which he often made her wash afterwards.

- The assaults occurred at both the Oakland Street house and the Dousman Street house.

- If she told Salinas she did not want to have sex with him, he hit or threatened her. Salinas struck her many times and told her if she refused sex, he would take her little brother away or send her away to Mexico or to California to live with her dad. He told her that if she

10

told her mother, he would blame her for "coming on to him" and if she told police, Salinas told V.G. that the police would take the children away from their mother.

- One time after an argument with her mother, Salinas did take her brother A.S. and left for 7-10 days.

- Salinas assaulted her "more than 40 to 50 times" over two and one-half years.

- On October 26, 2009, after her mother left for work, Salinas struck V.G. in the face because she did not want to have sex with him; he proceeded to sexually assault her.

- Later that day when her mother returned home from work, V.G. heard M.S. and Salinas arguing; Salinas told M.S. he had struck V.G., and M.S. was angry.  V.G. saw Salinas choking her mother and yelled at Salinas to let go of her.  M.S. told V.G. to leave the house and go; V.G. left the house and called police from a neighbor's house.

- When police came, V.G. reported that Salinas hit her but did not report the sexual assaults, "[b]ecause I just wanted him gone because I thought that with him gone it just wouldn't be going through all the things that I was going through, and I thought that was just -- I was afraid and just embarrassed and ashamed of everything."

- She was also worried her mom "would be ashamed" and upset and "blame herself because she never caught on, and we had been living together all of us for so long."

11

- She testified that the police took Salinas to jail and the phone calls from him started. She said she spoke with Salinas only one time and he asked her to change her statement and tell the sentencing court she missed him and wanted him home.

- She went to the sentencing hearing because her mom asked her to go. V.G. thought if she attended the hearing, the excessive phone calls would stop and maybe Salinas would change. Also, she had been promised a phone card, and her little brother, A.S., was missing his dad.

- Two days after the sentencing, V.G. told her boyfriend, E.D., about the sexual assaults because she wanted to be honest with him. E.D. insisted she tell her mom and her mom took her to the police station to report the sexual assaults.

¶20 M.S.'s testimony began by describing what happened on October 26, 2009. She had worked that day and when she arrived home, Salinas told her he had hit V.G. for not listening to him. This started an argument and Salinas threw a glass candle at her that struck her head. At this point, Salinas's lawyer objected:

> Your Honor, I just have to object to this line of questioning. Mr. Salinas has pled guilty to all these things. They've been litigated before. There was a physical altercation. Let's move on. This is unfairly prejudicial. She's just bringing this up to try and say later on look how bad Luis Salinas is. He must have done it.

The prosecutor responded: "[T]his is all information that is part of [M.S.]'s statement. It is part of the allegations in

12

this case. It certainly goes to the heart of the intimidation." The circuit court overruled the objection: "I'm going to allow it. I think it goes to Counts Four and Five [intimidation counts] in terms of giving context or background. I'm going to allow you to cross-examine."

¶21 M.S. continued describing the events of October 26, 2009:

- Salinas put his hands on her neck and tried to choke her; she told V.G. to get out of the house; she grabbed Salinas's hair and escaped his grasp and ran outside.

- When she turned back, her son, A.S., was standing in the doorway and Salinas was telling A.S. to ask her to come back inside. Salinas had a knife in his hand but it was not pointed at A.S.

- Salinas told V.G. to hang up the phone she was using to call police or "he was going to kill the boy and he was going to kill himself."

- Police arrived and arrested Salinas.

¶22 M.S. also testified about the phone calls Salinas made to her from jail. Salinas told her to change her statement to police to say he did not try to strangle her and he did not threaten to kill her. Salinas asked her to convince V.G. to change her statement to say Salinas did not hit her. M.S. told the jury she in fact tried to change her statement with police because she believed if she did not, Salinas would take her son away and he would kill her and her children.

13

¶23 M.S. explained why she went to Salinas's sentencing hearing on May 11, 2010: Salinas made her feel guilty, blaming M.S. and V.G. for putting him in jail, and Salinas threatened to kill himself if she did not come. He also promised he would change and things would be better if she came to the sentencing and spoke in favor of him coming home. M.S. admitted she pressured V.G. to come to the sentencing when V.G. did not want to go. She promised V.G. a phone card if she would attend and tell the court she wanted Salinas to come home.

¶24 M.S. testified that V.G. told her about the sexual assaults on May 13, 2010, and she took V.G. to the police to report what had happened. M.S. also told the jury that for the last two years, Salinas refused to let V.G. go out of the house with M.S. because Salinas said V.G. "misbehaved." She testified about how Salinas forced V.G. to stay home from school for a month in the Fall of 2009, her sophomore year in high school.

¶25 V.G.'s boyfriend, E.D., also testified. He talked about meeting V.G. in French class at the start of the school year, but that V.G. stopped coming to school until after October 26, 2009. When V.G. returned, they became friends and then boyfriend-girlfriend. E.D. described how, on May 13, 2010, V.G. disclosed the sexual assaults to him, that she was scared and shaky, and how it was hard for her to talk about the assaults. He told her to tell her mom and the police.

¶26 The parties stipulated that Salinas made over 500 phone calls to M.S. from jail. V.G.'s statement from Salinas's

sentencing for the domestic violence convictions was read to the jury.  The statement provided:

> I wanted to say that -- well, I don't have it on paper but I wanted to say that our family has gone through a lot the last few months that he hasn't been at our house and we're all sad that he's not here so -- and we'd really like him to come home.  That's all I wanted to say.

¶27  The circuit court gave jury instructions, including an instruction that remarks by attorneys are not evidence and an instruction that closing arguments are opinion and not evidence. The circuit court cautioned the jury regarding Salinas's prior convictions:[5]

> Now, evidence has been received in this case that the defendant, Luis Salinas, has been convicted of crimes.  This evidence was received solely because it bears upon the credibility of the defendant as a witness. You must not use it for any other purpose and particularly you should bear in mind that a criminal conviction at some previous time is not proof of guilt of the offense now charged.

¶28  During closing argument, the prosecutor recounted what happened the evening of October 26, 2009:

> [V.G.] hear[s] arguing between her mother and [Salinas].  [V.G.] waits and she goes out and she sees the defendant choking her mother and she's yelling. Her mother is yelling "get out, get out."  She's able to go to the front door.  Her mother is able to get away from the defendant and go out the side.
>
> And, ladies and gentlemen, I would submit at this point the defendant is very concerned.  To this point

---

[5] Salinas testified he had been convicted 12 times.  The circuit court, in essence, gave the standard jury instruction on prior convictions.  See Wis JI——Criminal 327.

15

> he's been able to keep them from calling the police. He's been able to intimidate them, use threats, use violence to make sure the police don't get involved. But this time they're out of the house. And what does he do in a last [d]itch effort and desperation? He takes a knife and he takes his little boy, the little boy he claims to love more than anything. He has a knife in one hand and he's telling [M.S.] get back in the house. He's telling the little boy, "Tell your mother to get back in the house or I'm going to kill myself and I'm going to kill the boy."

Salinas's lawyer argued to the jury that this case was not about the battery and strangulation, that Salinas was already punished for that and "that's not what we're here to decide today." He also pointed out that V.G. and M.S. had "very vivid" and detailed memories of the domestic violence incident, but V.G. had "very little recall of the sexual assaults." He argued that the "glossing over" of the sexual assault allegations should convince the jury that the sexual assaults never happened. The jury convicted Salinas on all three sexual assault counts and both intimidation counts.

¶29 Salinas appealed, arguing that joinder was improper and not harmless error. The court of appeals agreed and reversed in a per curiam, unpublished opinion. See State v. Salinas, No. 2013AP2686, unpublished slip op. (Wis. Ct. App. Apr. 21, 2015)(per curiam). The State petitioned this court for review and we granted the petition.

## II. STANDARD OF REVIEW

¶30 The issue presented on appeal is whether joinder of the intimidation and sexual assault charges was proper under Wis. Stat. § 971.12(1). The initial decision on joinder is a

16

question of law that we review de novo. See State v. Locke, 177 Wis. 2d 590, 596-97, 502 N.W.2d 891 (Ct. App. 1993); State v. Hoffman, 106 Wis. 2d 185, 208-09, 316 N.W.2d 143 (Ct. App. 1982). This case does not involve a motion for severance after initial joinder, which is reviewed under an erroneous exercise of discretion. See id. Although neither party disputes the de novo standard of review on initial joinder, some Wisconsin cases have applied a discretionary standard of review to both the initial joinder decision and the decision on a motion to sever. See Haldane v. State, 85 Wis. 2d 182, 188-89, 270 N.W.2d 75 (1978)("Generally, questions of consolidation or severance are within the trial court's discretion."); Holmes v. State, 63 Wis. 2d 389, 395-96, 217 N.W.2d 647 (1974)("What is involved is an exercise of trial court discretion."); State v. Brown, 114 Wis. 2d 554, 559, 338 N.W.2d 859 (Ct. App. 1983)(same). We make clear here that those cases inaccurately described the proper standard of review. As noted, the initial joinder decision and a decision to sever properly joined charges are distinct considerations that require different standards of review. As Locke explained:

> On appeal, review of joinder is a two-step process. First, the court reviews the initial joinder determination. Whether the initial joinder was proper is a question of law that we review without deference to the trial court, and the joinder statute is to be construed broadly in favor of the initial joinder.
>
> . . .
>
> [Second,] [s]ection 971.12(3) provides that even after initial joinder, the court may order separate trials

17

of the charges if it appears that a defendant is prejudiced by a joinder of the counts. A motion for severance is addressed to the trial court's discretion.

*Locke*, 177 Wis. 2d at 596-97. Here, because the issue in Salinas's case involves only whether the initial joinder decision was proper, our review is de novo.

### III. ANALYSIS

¶31 Wisconsin Stat. § 971.12(1) describes when separate crimes may be joined together in the same complaint:

JOINDER OF CRIMES: Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

The joinder statute is to be broadly construed in favor of initial joinder. See *Francis v. State*, 86 Wis. 2d 554, 558, 273 N.W.2d 310 (1979)("A broad interpretation of the joinder provision is consistent with the purposes of joinder, namely trial convenience for the state and convenience and advantage to the defendant."); *Locke*, 177 Wis. 2d at 596. The statute provides four separate provisions under which initial joinder is deemed proper: (1) when two or more crimes are of the "same or similar character"; (2) when two or more crimes are based on the "same act or transaction"; (3) when two or more crimes are based on two or more acts or transactions that are "connected together"; or (4) when two or more crimes are based on two or

18

more acts or transactions that constitute "a common scheme or plan." Wis. Stat. § 971.12(1).

¶32 The State argues joinder was proper under Wis. Stat. § 971.12(1) because the intimidation and sexual assault charges are either: (1) two or more acts connected together; or (2) two or more acts or transactions constituting parts of a common scheme or plan.[6] Salinas argues the intimidation and sexual assault charges do not fall into either category because the intimidating phone calls relate only to the domestic violence convictions, not the sexual assaults, and are so different they cannot constitute a common scheme or plan. Salinas also argues that the improper joinder of these charges prejudiced him and therefore was not harmless error. We hold that the charges here were properly joined because they were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan", the charges were "connected together" and the charges constituted "parts of a common scheme or plan." Because we determine joinder was proper, we do not address Salinas's harmless error argument.

¶33 Before we begin our analysis, we note that although "connected together" and "common scheme or plan" are separate and distinct prongs in the joinder statute, Wisconsin case law has, on occasion, merged them into a single concept, suggesting

---

[6] The State conceded the facts do not support joinder based on the sexual assaults and intimidation being crimes: (1) of the "same or similar character," or (2) based on the "same act or transaction."

the same analysis applies to both. See Francis, 86 Wis. 2d at 560. In Francis, neither victim could identify Francis, but after police were able to link Francis to the crimes against one of the victims, they were able to connect Francis to the crimes against the other victim based on similar modus operandi. Id. at 555-56, 560. The State filed a complaint charging Francis with three crimes against the two victims; the circuit court denied his motion to sever, and a jury found him guilty of all charges. Id. at 556. On appeal to this court, Francis argued only that initial joinder was improper, making no argument on whether the circuit court's severance decision caused prejudice. Id. at 555, 561-62. We upheld joinder as proper based on "the phrase 'connected together or constituting parts of a common scheme or plan.'" Id. at 555-56, 560. We so held because this phrase had been interpreted by other courts to mean: "inter alia that the crimes charged have a common factor or factors of substantial factual importance, e.g., time, place or modus operandi, so that the evidence of each crime is relevant to establish the identity of the perpetrator." Id. at 560.

¶34 We have also, at least implicitly, upheld joinder based solely on the "connected together" language and solely on the "constituting parts of a common scheme or plan" language of Wis. Stat. § 971.12(1). In State v. Bettinger, 100 Wis. 2d 691, 303 N.W.2d 585 (1981), we held there could be "no dispute" that joinder of the sexual assault charge with the bribery charge was proper under Wis. Stat. § 971.12(1) because the two acts were "connected together." Id. at 694. In Bettinger, the identity

20

of the perpetrator was not in dispute as he was a friend of the family. Id. at 692-93. Bettinger sexually assaulted the victim and then offered her a bribe to drop the charges or not cooperate with the prosecution. Id. at 693. No one disputed that these two separate crimes were properly joined because they were "connected together." Id. at 694. They were connected together because both crimes involved the same victim and the same perpetrator and because the bribery was an attempt to avoid conviction on the sexual assault.

¶35 In State v. Kramer, 45 Wis. 2d 20, 171 N.W.2d 919 (1969), this court upheld joinder on five separate crimes of two unrelated victims using the "common scheme or plan" provision. Id. at 24, 36.[7] Kramer was convicted of false imprisonment, injury by conduct regardless of life, armed robbery and two counts of physical damage to property. Id. at 24. The "common scheme or plan" involved crimping the gas line of women's cars to disable the vehicle and then offering to give the stranded women a ride. Id. at 24-26. We held joinder proper based on this common scheme or plan. Id. at 36.

---

[7] In State v. Kramer, 45 Wis. 2d 20, 171 N.W.2d 919 (1969), Wisconsin was still using the prior joinder statute, Wis. Stat. § 955.14(1)(1967), which provided: "Different crimes and different degrees of the same crime may be joined in one information, indictment or complaint." However, in Kramer this court cited Federal Criminal Rule 8(a), the federal joinder statute, which is substantially similar to the language of our current joinder statute at issue here.

21

¶36 This case presents us with the opportunity to analyze whether the charges joined in Salinas's case should be upheld because they were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan," the charges were "connected together," and the charges constituted "parts of a common scheme or plan." Before we proceed with that analysis, we emphasize that this court "has historically favored" initial joinder particularly when the charged crimes were all "committed by the same defendant." See Francis, 86 Wis. 2d at 559 (citations and quotemarks omitted). We interpret initial joinder decisions broadly because of the goals and purposes of the joinder statute: (1) trial economy and convenience; (2) to promote efficiency in judicial administration; and (3) to eliminate multiple trials against the same defendant, which promotes fiscal responsibility. See id., at 560; State v. Leach, 124 Wis. 2d 648, 671, 370 N.W.2d 240 (1985).

A. Connected together or
constituting parts of a common scheme or plan

¶37 As we have seen, in Francis, we held joinder proper because the separate crimes were connected together by a common scheme or plan. In doing so, we did not analyze "connected together" separately from "constituting parts of a common scheme or plan." Citing several federal cases, we observed that the entire phrase "connected together or constituting parts of a common scheme or plan" has been interpreted, among other things, to mean "that the crimes charged have a common factor or factors

22

of substantial factual importance, e.g., time, place or modus operandi, so that the evidence of each crime is relevant to establish a common scheme or plan that tends to establish the identity of the perpetrator." Id., 86 Wis. 2d at 560. In other words, Francis's modus operandi connected the separate crimes together and helped identify Francis as the person who had committed these separate crimes. Id. at 560-61. Thus, in joinder cases following Francis, most of which are unpublished, the "common factor or factors of substantial factual importance" test has been used both to analyze whether joinder is proper under the entire phrase, under connected together, and under constituting parts of a common scheme or plan.

¶38 Using the Francis test, we hold the crimes joined against Salinas are "connected together or constituting parts of a common scheme or plan" because Salinas's crimes share common factors or factors of substantial factual importance. First, V.G. was a victim of both the sexual assaults and the intimidation crimes, which were charged after the domestic violence conviction. Second, the last sexual assault occurred on the same day as the domestic violence incident. Third, Salinas's domestic violence toward V.G. immediately preceded the sexual assault; Salinas used the physical abuse to accomplish the sexual assault. Fourth, the intimidation charges and sexual assault charges were close in time, involved the same people, and Salinas arguably engaged in one crime to prevent disclosure and punishment for another.

23

¶39 Although Francis discusses joinder in terms of the crimes having substantial factors of a common scheme or plan that establish identity, the law is not so limited. In Francis, we indicated this statutory phrase had "been interpreted to mean inter alia" what is quoted above. Id., 86 Wis. 2d at 560. Inter alia means "among other things." In other words, the identity link was one meaning given to the statutory phrase in cases where identity is at issue. In cases where identity is not at issue, however, the statutory phrase is not so limited.

¶40 Here, as in Bettinger, the perpetrator is known because the situation involves a family. Salinas is the perpetrator in both the intimidation and sexual assault crimes. The perpetrator and victims resided together as part of the same familial unit with daily interactions. V.G. was a victim of the domestic violence, intimidation, and sexual assault crimes. Salinas used domestic violence toward V.G. to overcome her objections to having sexual intercourse with him. Salinas created an atmosphere of fear, engaging in a scheme or plan of manipulation, coercion, and intimidation to control and abuse M.S. and V.G. The crimes of domestic violence and sexual assault are connected because Salinas used both to establish control over V.G. and M.S. that allowed him to break the law without legal repercussions. Once incarcerated, Salinas could no longer use physical or sexual abuse to control his victims so he attempted to influence and control them through the use of the telephone. Salinas made 500-plus phone calls including threats that he would still be able to exert control from jail.

24

The phone calls show manipulation done by phone to force V.G. and M.S. to recant their claims of physical abuse and help get him out of jail so he could continue his illegal acts without legal repercussions. The intimidation charges arising from the phone calls are part of Salinas's scheme or plan to manipulate and control V.G. and M.S. so he could physically abuse and sexually assault these victims without legal repercussions. That is the evidence the State presented.

¶41 We also face the situation here where V.G. reported the domestic violence but delayed reporting the sexual assault crimes, even though one count of each crime occurred on the same day. Had V.G. reported the sexual assault crimes at the same time she reported the domestic violence incident, both the sexual assault crimes and the domestic violence crimes would have been charged in a single complaint. Had the intimidation counts arisen after a trial on both the domestic violence and sexual assault crimes, there would be no question that the intimidation charges were connected to the sexual assaults. A subsequent trial on intimidation would have necessarily included evidence on both the domestic violence incident and the sexual assaults. Delayed reporting on the sexual assaults should not operate to disconnect these inextricably intertwined events. These charges are closely related and interconnected. Likewise, failure to come forward on the sexual assaults does not extinguish the relatedness of these crimes or render initial joinder improper. These crimes were logically connected, grew out of related interactions, and had a concrete connection.

25

### B. Connected together

¶42 The "connected together" provision of Wis. Stat. § 971.12(1) is used to join together offenses committed by the same defendant that are based on separate acts or transactions against the same victim or separate victims. "Connected together" is not defined in the statute, nor has it been specifically defined by Wisconsin courts. This is so because the words are self-defining.

¶43 Salinas argues the intimidation counts are not connected to the sexual assaults; rather, he argues the intimidation counts relate only to the domestic violence convictions. In assessing whether separate crimes are sufficiently "connected together" for purposes of initial joinder, we look to a variety of factors, including but not limited to: (1) are the charges closely related; (2) are there common factors of substantial importance; (3) did one charge arise out of the investigation of the other; (4) are the crimes close in time or close in location, or do the crimes involve the same victims; (5) are the crimes similar in manner, scheme or plan; (6) was one crime committed to prevent punishment for another; and (6) would joinder serve the goals and purposes of Wis. Stat. § 971.12. See Francis, 86 Wis. 2d at 560; State v. Hall, 103 Wis. 2d 125, 139, 307 N.W.2d 289 (1981)(connected because "closely related in terms of time, place and modus operandi, scheme, or plan"); Bettinger, 100 Wis. 2d at 694; Leach, 124 Wis. 2d at 671 (The purpose of joinder is to promote

economy and efficiency in judicial administration and avoid multiple trials.).

¶44 Many of these factors apply in this case. The intimidation charges and the sexual assaults are connected together because they are closely related, share common factors of substantial importance, are connected by time, location and victims, and joinder serves the goals and purposes of Wis. Stat. § 971.12. These crimes are closely related as a series of events within one household involving one defendant and two victims. The crimes joined were connected together because the domestic violence against V.G. and M.S. occurred on the same day that Salinas sexually assaulted V.G., and the intimidation charges involved coercion and threats to manipulate V.G. and M.S. to withdraw their statements of physical abuse and to persuade the sentencing judge to let Salinas go home. The goals behind the joinder statute are clearly satisfied here because all of Salinas's outstanding crimes against V.G. and M.S. were resolved in one trial, the victims had to testify only once, and the judicial resources utilized to mete out justice were efficiently conserved. See Leach, 124 Wis. 2d at 671. Thus, the intimidation counts and the sexual assaults are "connected together" and joinder was proper under that provision of § 971.12(1).

C. Constituting parts of a common scheme or plan

¶45 We also hold that initial joinder was proper because the intimidation and sexual assault charges constituted parts of a "common scheme or plan." Neither the statute nor this court

27

has specifically defined "common scheme or plan" as that term is used in Wis. Stat. § 971.12(1). Because these are common words with known meanings, it is not necessary for us to provide a particular definition here.[8]

¶46 In analyzing whether Salinas's intimidation charges and sexual assault charges constitute a "common scheme or plan," we look to what evidence the State presented to support its position that the charges were properly joined under this provision. The State presented evidence that all of Salinas's crimes constituted parts of his common scheme or plan to use threats, intimidation, physical and sexual abuse to maintain power and control over the woman with whom he lived, as well as her daughter, so he could break the law without risk of getting caught. The State argued he created a pattern of violence, threats, and intimidation so that he could continue to physically and sexually abuse his girlfriend and her daughter without consequence or reporting. In order to continue to engage in his illegal acts and ensure neither M.S. or V.G. reported Salinas's illegal behavior, he used threats and physical and sexual abuse. On October 26, 2009, V.G. and M.S. broke the veil

---

[8] Wisconsin case law has defined the term "plan" as "plan" is used in Wis. Stat. § 904.04(2) to mean "a design or scheme formed to accomplish some particular purpose." See State v. Cofield, 2000 WI App 196, ¶13, 238 Wis. 2d 467, 618 N.W.2d 214 (citing State v. Spraggin, 77 Wis. 2d 89, 99, 252 N.W.2d 94(1977)). The phrase in Wis. Stat. § 971.12(1), however, is "common scheme or plan" whereas Wis. Stat. § 904.04(2) uses solely "plan."

of silence by calling police.  As a result, Salinas lost his ability to physically and sexually assault them.  But he still had the ability to threaten and manipulate with his words via the telephone.  He did this by calling M.S. over 500 times from jail, convincing her to lie to police and tell them he did not try to strangle her as she had reported.  He did this by trying to get V.G. to lie and say he did not hit V.G. as she had reported.  He did this by trying to get M.S. to pressure or bribe V.G. with the phone card.  Salinas, in fact, succeeded in his threats and intimidation because both M.S. and V.G. attended his sentencing for the domestic violence and testified on his behalf.  The jail phone calls used to intimidate and control V.G. and M.S. were an integral part of Salinas's common plan or scheme to continue his illegal acts.  The evidence presented by the State sufficiently supported initial joinder of the intimidation and sexual assault counts as parts of Salinas's "common scheme or plan" to control and assault his girlfriend and her daughter in his home.  Thus, initial joinder was also proper under this provision of Wis. Stat. § 971.12(1).

### D.  Harmless Error

¶47 Because initial joinder was proper, we need not address harmless error.  See Leach, 124 Wis. 2d at 669.  We do note, however, that this case is unusual because often joinder cases concomitantly involve a severance claim.  See, e.g., State v. Linton, 2010 WI App 129, ¶¶15-16, 329 Wis. 2d 687, 791 N.W.2d 222; Locke, 177 Wis. 2d at 596-99.  That is, a defendant will argue both that initial joinder was improper and that even if it

29

was proper, severance was necessary based on prejudice as set forth in Wis. Stat. § 971.12(3): "If it appears that a defendant . . . is prejudiced by a joinder of crimes . . . the court may order separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." In fact, some cases present only the issue of severance on appeal as there is no dispute that the initial joinder decision was proper. See, e.g., Bettinger, 100 Wis. 2d at 694 ("There can be no dispute in this case that joinder of these two charges was authorized by sec. 971.12(1), Stats.")(footnote quoting statute omitted).

¶48 It is unclear from the record why Salinas did not request severance based on prejudice. The record shows that Salinas's lawyer did make one objection when M.S. testified about the domestic violence incident, but the circuit court overruled the objection finding the testimony was relevant to context and background. See State v. Marinez, 2011 WI 12, ¶26, 331 Wis. 2d 568, 797 N.W.2d 399 (evidence admissible for context "to provide a more complete story of the sexual assault . . . as well as to provide greater information from which the jury could assess [the child victim's]credibility"). The record also shows the circuit court cautioned Salinas against pleading on the intimidation counts if his only reason for doing so was an expectation that the pleas would result in total exclusion of the domestic violence evidence. The circuit court explained that the domestic violence evidence would most likely come in anyway under Wis. Stat. § 904.04's "other acts" test. See Hall,

30

103 Wis. 2d at 142-43 (other acts evidence otherwise inadmissible may come in when offered for an accepted purpose, as long as they are relevant and not unfairly prejudicial).

¶49 Salinas's lawyer represented at oral argument that although the reason for failing to file a severance motion was not clear from the record, it most likely stemmed from the circuit court's repeated indications that the domestic violence evidence would be admitted. Failing to make a severance motion, regardless of the reason, however, results in this issue not being ripe for our consideration. Thus, our opinion is limited to our holding that initial joinder here was proper.

## IV. CONCLUSION

¶50 In sum, we hold that the initial decision to join the intimidation charges with the sexual assault charges was proper because these crimes were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan." See Wis. Stat. § 971.12(1). Initial joinder was proper under this entire phrase, under the "connected together" provision, and under the "common scheme or plan" provision. Because initial joinder was proper, we do not address harmless error.

*By the Court.*—The decision of the court of appeals is reversed.

¶51 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* At issue in the instant case is whether joinder of several criminal charges against the defendant, Luis Salinas——two charges of intimidation of a victim and one charge each of repeated sexual assault of a child, second-degree sexual assault with use of force, and second-degree sexual assault of a child——was proper under the criminal joinder statute, Wis. Stat. § 971.12(1) (2009-10).[1]

¶52 Construing Wis. Stat. § 971.12(1) "broadly,"[2] the majority opinion concludes that the sexual assault charges and the victim intimidation charges were properly joined because they "were '2 or more acts or transactions connected together or constituting parts of a common scheme or plan.'"[3]

---

[1] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

[2] Majority op., ¶¶30, 31, 36.

[3] The following sentences of the majority opinion are difficult to understand and are not necessarily consistent:

> We hold that joinder was proper because the charges joined were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan," the charges were "connected together," and the charges constituted parts of a "common scheme or plan."

Majority op., ¶2 (citing Wis. Stat. § 971.12(1)).

> [I]nitial joinder is deemed proper: . . . (3) when two or more crimes are based on two or more acts or transactions that are "connected together"; or (4) when two or more crimes are based on two or more acts or transactions that constitute "a common scheme or plan."

Majority op., ¶31.

(continued)

1

¶53 I disagree with the majority opinion. I would affirm the decision of the court of appeals that joinder was improper. I write separately in dissent for three reasons.

¶54 First, the majority opinion's discussion of the criminal joinder statute, Wis. Stat. § 971.12(1),[4] is confusing and appears internally inconsistent.

¶55 The joinder statute sets forth four different bases for joinder: (1) the charged crimes are of the same or similar character; or (2) the charged crimes are based on the same act or transaction; or (3) the charged crimes are based on two or

---

> This case presents us with the opportunity to analyze whether the charges joined in Salinas's case should be upheld because they were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan, the charges were "connected together," and the charges constituted "parts of a common scheme or plan."

Majority op., ¶36.

> In sum, we hold that the initial decision to join the intimidation charges with the sexual assault charges was proper because these crimes were "2 or more acts or transactions connected together or constituting parts of a common scheme or plan."

Majority op., ¶50.

[4] Wisconsin Stat. § 971.12(1) states (in relevant part):

> **971.12 Joinder of crimes. (1)** Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. . . .

2

more acts or transactions connected together; or (4) the charged crimes constitute parts of a common scheme or plan. The first two bases are not relevant in the instant case and are not discussed by the majority opinion. Only the third and fourth bases are discussed by the majority opinion.

¶56 After noting that "'connected together' and 'common scheme or plan' are separate and distinct prongs of the joinder statute," the majority opinion conflates the two prongs as well as analyzing them separately. See majority op., ¶¶32, 33, 37, 42, 45.

¶57 Second, I question whether the "broad" construction of the joinder statute adopted in Francis v. State, 86 Wis. 2d 554, 558, 273 N.W.2d 310 (1979), and applied by the majority opinion is warranted in the instant case. Both the relevant text of the joinder statute, Wis. Stat. § 971.12(1), and the overwhelming evidence that joinder of multiple charges prejudices criminal defendants militate against a "broad" interpretation of joinder in criminal cases.[5]

---

[5] See, e.g., Andrew D. Leipold & Hossein A. Abbasi, The Impact of Joinder and Severance on Federal Criminal Cases: An Empirical Study, 59 Vand. L. Rev. 349, 383-84 (2006) (concluding, based on empirical data, that a "defendant's chances of conviction increase by more than 10% if he stands trial on more than one count."); James Farrin, Note, Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice, 52 Law & Contemp. Probs. 325, 327-31 (1989) (reviewing a variety of empirical studies showing joinder of multiple charges may result in jury confusion, incorrect weighing of the evidence, and improper jury inferences of criminality; studies unanimously found an increase in the likelihood of conviction of defendants facing joined charges).

¶58 Third, regardless of how Wis. Stat. § 971.12 is interpreted ("broadly" or otherwise), the majority opinion overstates the factual and legal connections between the sexual assault charges and the victim intimidation charges. I agree with the court of appeals' decision that the sexual assault charges and the victim intimidation charges are, at most, tangentially related. As a result, the majority opinion's conclusion that the sexual assaults and victim intimidation charges are "2 or more acts or transactions connected together or constituting parts of a common scheme or plan" is mistaken.

¶59 For the reasons set forth, I dissent and write separately.

I

¶60 I begin with the criminal joinder statute, Wis. Stat. § 971.12(1). Wisconsin Stat. § 971.12(1) states (in relevant part and with emphasis added):

> **971.12 Joinder of crimes.** (1) Two or more crimes may be charged in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on <u>2 or more acts or transactions connected together or constituting parts of a common scheme or plan</u>. . . .

¶61 As I stated previously, the joinder statute sets forth four different bases for joinder. The parties do not dispute that the sexual assaults and victim intimidation charges are not "of the same or similar character" and are not "based on the same act or transaction . . . ." Wis. Stat. § 971.12(1). Rather, the parties' arguments and the majority opinion's

4

discussion focus on whether the sexual assaults and victim intimidation constitute "2 or more acts or transactions connected together or constituting parts of a common scheme or plan." Wis. Stat. § 971.12(1).

¶62 The majority opinion's treatment of this language——"2 or more acts or transactions connected together or constituting parts of a common scheme or plan"——is confusing and appears to be internally inconsistent.

¶63 The majority opinion restates this language in several different ways. <u>See</u> note 3, <u>supra</u>.

¶64 Although the majority opinion states that "'connected together' and 'common scheme or plan' are separate and distinct prongs in the joinder statute," the majority opinion begins its analysis by conflating the two, analyzing whether "the separate crimes were connected together <u>by</u> a common scheme or plan." <u>See</u> majority op., ¶¶33, 37. Later, however, the majority opinion analyzes each of these prongs of the joinder statute separately. <u>See</u> majority op., ¶¶42-46.

¶65 In sum, these differing approaches at different parts of the opinion are confusing and potentially inconsistent.

¶66 In my view, Wis. Stat. § 971.12(1) sets forth four bases for joinder including when two or more acts or transactions are connected together or two or more acts or transactions constitute parts of a common scheme or plan. These two bases for joinder do not have the same meaning, but the same fact situation may satisfy both bases.

II

5

¶67 Next, I question whether the "broad interpretation" of the joinder statute stated in Francis v. State, 86 Wis. 2d 554, 558, 273 N.W.2d 310 (1979), and repeated in the majority opinion and other cases without careful analysis is warranted in the instant case.[6]

¶68 Two factors militate against "broadly" interpreting the joinder statute in the instant case: (1) The text of the joinder statute; and (2) empirical evidence that joinder of multiple charges prejudices criminal defendants.

¶69 The text of Wis. Stat. § 971.12(1), the criminal joinder statute, does not state, as the majority opinion does, that the statute should be given a broad interpretation in favor of joinder. The legislature has not instructed, as it sometimes does, how the text should be construed: broadly, narrowly, liberally, or strictly.[7]

¶70 Rather, the directive of broad interpretation of the joinder statute stems from a 1979 case, Francis v. State, 86 Wis. 2d 554, 558-59, 273 N.W.2d 310 (1979). In Francis, this court recognized that the joinder statute does not require joinder of two or more charges, and joinder of two or more

_____

[6] See majority op., ¶¶30-31, 36; see also State v. Prescott, 2012 WI App 136, ¶15, 345 Wis. 2d 313, 825 N.W.2d 515; State v. Bellows, 218 Wis. 2d 614, 622, 582 N.W.2d 53 (Ct. App. 1998); State v. Hoffman, 106 Wis. 2d 185, 208, 316 N.W.2d 143 (Ct. App. 1982).

[7] See, e.g., Wis. DWD v. Wis. DOJ, 2015 WI 114, ¶¶30-34, 365 Wis. 2d 694, 875 N.W.2d 545 (refusing to liberally construe Wis. Stat. §§ 230.80-.89 despite clear legislative directive in Wis. Stat. § 230.02 to "construe[ ] [the statutes] liberally in aid of the purposes declared . . . .").

6

charges does not require a joint trial on the charges.[8] The _Francis_ court observed that "[a] broad interpretation of the joinder provision is consistent with the purposes of joinder, namely trial convenience for the state and convenience and advantage to the defendant."[9] The majority opinion agrees that a broad interpretation of the joinder statute fits these convenience and efficiency goals.[10]

¶71 In support of its "broad interpretation" of Wis. Stat. § 971.12, the _Francis_ court relied on a 1961 article by Frank J. Remington and Allan J. Joseph, titled _Charging, Convicting, and Sentencing the Multiple Criminal Offender_, 1961 Wis. L. Rev. 528, 538-39. Remington and Joseph stated that joinder of multiple charges generally promotes convenience and efficiency and can be beneficial to defendants. The traditional policy in favor of joinder is one of administrative convenience.[11]

---

[8] _Francis v. State_, 86 Wis. 2d 554, 558, 273 N.W.2d 310 (1979).

[9] _Francis_, 86 Wis. 2d at 558-59 (citing Frank J. Remington & Allan J. Joseph, _Charging, Convicting, and Sentencing the Multiple Criminal Offender_, 1961 Wis. L. Rev. 528, 538-39).

[10] _See_ majority op., ¶36 ("We interpret initial joinder decisions broadly because of the goals and purposes of the joinder statute: (1) trial economy and convenience; (2) to promote efficiency in judicial administration; and (3) to eliminate multiple trials against the same defendant, which promotes fiscal responsibility.") (citing _Francis_, 86 Wis. 2d at 560; _State v. Leach_, 124 Wis. 2d 648, 671, 370 N.W.2d 240 (1985)).

[11] _See_ Note, _Criminal Law——Joinder and Severence Under the New Wisconsin Criminal Procedure Code_, 1971 Wis. L. Rev. 604, 606.

7

¶72 Although <u>Francis</u> was correct that a broad interpretation of Wis. Stat. § 971.12(1) is consistent with the purposes of joinder discussed therein, namely trial convenience, judicial efficiency, and convenience to a defendant,[12] Remington and Joseph cautioned that "joinder of several offenses in a single proceeding may, under some circumstances, be prejudicial to the defendant."[13] The defendant in the instant case in effect objected to the joinder of charges because joinder would enable the prosecution to introduce evidence irrelevant and unrelated to the other criminal charges.

---

[12] Wisconsin Stat. § 971.12(1) is modeled after Federal Rule of Criminal Procedure 8. In interpreting and applying Wis. Stat. § 971.12(1), federal authorities assist in my analysis. <u>See</u> <u>State v. Gudenschwager</u>, 191 Wis. 2d 431, 439, 529 N.W.2d 225 (1995).

In analyzing Federal Rule of Criminal Procedure 8, Wright's <u>Federal Practice and Procedure</u> states that a broad interpretation of the joinder statute will allow joinder regardless of whether it is just or fair. 1A Charles Alan Wright et al., <u>Federal Practice And Procedure</u> § 143 (3d ed. 1999); <u>see also</u> Thomas C. Wales, Note, <u>Harmless Error and Misjoinder Under the Federal Rules of Criminal Procedure: A Narrowing Division of Opinion</u>, 6 Hofstra L. Rev. 533, 536-37 n.14 (1978):

> For the defendant who goes to trial properly joined under [federal] rule 8, the chances of receiving a separate trial at a later time are unlikely at the trial level and even less likely on appeal . . . . It is for this reason that the courts' interpretation of [federal] rule 8 and what they first determine to be the bounds of proper joinder are of central importance. A broad interpretation of rule 8 means broad joinder.

[13] Frank J. Remington & Allen J. Joseph, <u>Charging, Convicting, and Sentencing the Multiple Criminal Offender</u>, 1961 Wis. L. Rev. 528, 538-39.

8

¶73 The emphasis in _Francis_ was on the value of joinder to the administration of justice. The language in _Francis_ regarding a "broad interpretation" of the joinder statute makes sense when limited to the administrative convenience purposes stressed therein. Efficiency is an important value. Outside of joinder for pretrial purposes, however, we should not broadly interpret the joinder statute because the efficiency gained by joining multiple charges for trial may result in significant prejudice to the defendant. Interpreting the joinder statute according to its text, without the patina of "broad interpretation," avoids undue prejudice——another important value in criminal law.

¶74 We should not broadly interpret and apply the text of the four bases for joinder because, as recent empirical studies of joinder have demonstrated, joinder of multiple charges has a prejudicial effect on criminal defendants.

¶75 Empirical research, like other forms of evidence, can and should inform decision making (as it does elsewhere in the criminal justice system) in interpreting and applying the four bases for joinder. Indeed, Wisconsin has been a leader in

evidence-based decision making.[14] Examples of empirical studies describing the prejudice to defendants who face joinder of multiple charges are as follows:

- Edie Greene & Brian H. Bornstein, Nudging the Justice System Toward Better Decisions, 103 J. Crim. L. & Criminology 1155, 1163 (2013) (reviewing Dennis J. Devine, Jury Decision Making: The State of the Science (NYU Press 2012)):

   > [J]oinder of criminal charges biases jurors' judgments against a defendant because jurors attribute multiple instances of wrongdoing to a defendant's criminal disposition and confuse evidence relevant to multiple charges.

- Andrew D. Leipold & Hossein A. Abbasi, The Impact of Joinder and Severance on Federal Criminal Cases: An Empirical Study, 59 Vand. L. Rev. 349, 383 (2006) (emphasis added):

   > Joinder of counts has a significant impact on the outcome of trials. A

---

[14] See, e.g., Judge Elliot M. Levine, Evidence-Based Decision Making: EBDM in Wisconsin: A Primer, Wis. Counties, Aug. 2015, at 22; Planning & Policy Advisory Committee, Effective Justice Strategies Subcommittee, Phase II: Progress and Accomplishments 7 (Nov. 13, 2013) ("In the past 5 years, evidence-based practices in Wisconsin have gained strides in their use and understanding . . . ."), available at https://www.wicourts.gov/courts/programs/docs/finalreport.pdf; Mary Beth Kirven, National Center for State Courts, The Use of Evidence-Based Practices in Wisconsin Adult Drug Courts: An Overview 1 (2011-12) (identifying "court-related evidence-based strategies that enhance public safety, reduce recidivism, and address criminal and addictive behaviors . . . .") (quotation omitted).

defendant who stands trial on a single count is roughly 9 percentage points <u>less likely</u> to be convicted than defendants who face multiple counts.

- Andrew D. Leipold, <u>How the Pretrial Process Contributes to Wrongful Convictions</u>, 42 Am. Crim. L. Rev. 1123, 1142-43 (2005) (footnotes omitted):

   Joining charges or defendants in a single trial is a great resource saver, and it helps avoid the "scandal of inconsistent verdicts." The risks of joinder for the defense, however, are many. A defendant who is guilty of one charge but innocent of another may find it difficult to present separate defenses to separate charges, particularly if he wants to take the stand on the second count but not the first. More significantly, a jury considering an innocent defendant charged with multiple counts may infer a criminal disposition, or "may cumulate the evidence of the various crimes charged and find guilty, when, if considered separately it would not so find."

- James Farrin, Note, <u>Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice</u>, 52 Law & Contemp. Probs. 325, 330-31 (1989) (footnotes omitted):

   [T]he studies are unanimous in finding that defendants do face a greater likelihood of conviction if offenses are tried jointly rather than separately. . . . A cumulative compilation of all the joinder research findings shows that the effect of joinder of offenses is robust; there is a significantly greater likelihood of conviction for defendants. These findings have been constant despite

11

varying methodologies by the researchers.

- Kenneth S. Bordens & Irwin A. Horowitz, Information Processing in Joined and Severed Trials, 13 J. Applied Soc. Psych. 351, 369 (1983):

    > [J]urors in a joined trial situation cannot keep the two charges separate and arrive at independent verdicts.

¶76 These studies identify several reasons why joinder of multiple charges for trial leads to a significantly higher likelihood of conviction: Juries may be confused, may struggle to remember evidence going to numerous charges, may selectively remember only the evidence that confirms their ultimate conclusion, or may infer "that the defendant has a criminal personality type"[15] because of the multiple charges.[16]

¶77 Wisconsin case law echoes these concerns. "The potential problem as a result of a trial on joint charges is that a defendant may suffer prejudice since a jury may be incapable of separating the evidence relevant to each offense or because the jury may perceive a defendant accused of several crimes is predisposed to committing criminal acts."[17]

---

[15] Farrin, supra note 5, at 330.

[16] Although these writings focus largely on the risks of jury bias and confusion, at least one study concluded that the prejudicial effect of joining multiple charges is actually more substantial in bench trials than jury trials. See Leipold & Abbasi, supra note 5, at 383.

[17] State v. Leach, 124 Wis. 2d 648, 672, 370 N.W.2d 240 (1985) (citing State v. Bettinger, 100 Wis. 2d 691, 696-97, 303 N.W.2d 585 (1981)).

12

¶78 As a result, I conclude that a "broad" interpretation of the joinder statute is not justified in the instant case. Rather, the joinder statute should be interpreted using the interpretative tools ordinarily used in statutory interpretation.

### III

¶79 I turn now to the application of Wis. Stat. § 971.12(1) in the instant case. The majority opinion concludes that the circuit court properly joined the multiple sexual assault charges and the victim intimidation charges because they are "2 or more acts or transactions connected together or constituting parts of a common scheme or plan . . . ."[18] Wis. Stat. § 971.12(1). The instant case involves a third set of charges, not at issue here, that involve domestic abuse.

¶80 In reaching its conclusion, the majority opinion relies on the following:

- V.G. was the alleged victim of both victim intimidation and sexual assault. See majority op., ¶38.

- The last sexual assault allegedly took place on the same day as the domestic violence incident (to which the victim intimidation charge is related). See majority op., ¶38.

- "Salinas's domestic violence toward V.G. immediately preceded the [last] sexual assault." Namely, Salinas

---

[18] See majority op., ¶2.

13

allegedly slapped V.G. on the date of the domestic violence incident. See majority op., ¶38.

- The victim intimidation charges and sexual assault charges "were close in time, involved the same people, and Salinas arguably engaged in one crime to prevent disclosure and punishment for another." See majority op., ¶38.

- The majority opinion asserts that "[t]he State presented evidence that all of Salinas's crimes constituted parts of his common scheme or plan to use threats, intimidation, physical and sexual abuse to maintain power and control over the woman with whom he lived, as well as her daughter, so he could break the law without risk of getting caught." Majority op., ¶46.

¶81 The majority opinion's recounting of the "connections" between the sexual assault charges and the victim intimidation charges is seriously flawed. I agree with the decision of the court of appeals. It carefully applied Wis. Stat. § 971.12(1) and concluded that joinder of the sexual assault charges and the victim intimidation charges was improper.

¶82 First, although the sexual assault charges and the victim intimidation charges do have one victim in common, V.G., the majority opinion ignores the fact that M.S. was a victim only of the victim intimidation.

¶83 Second, the majority opinion overstates the facts it claims connect the sexual assault charges and the victim intimidation charges by relying on a third set of charges——the

14

domestic violence charges——that were not joined and are not at issue in the instant case.

¶84 Although the majority opinion correctly asserts that the last sexual assault allegedly occurred the same day as the domestic violence incident (which, in turn, led to the victim intimidation charges), V.G. alleged that Salinas sexually assaulted her dozens of times over a period of two and one-half years. Even if the last sexual assault incident were connected to the victim intimidation charges (through the domestic violence incident that is not at issue in this case), that single incident does not connect 2.5 years of sexual assaults to the intimidating phone calls. The intimidating phone calls were made nearly six months after the last of the sexual assaults allegedly occurred and one month before the sexual assaults were reported.

¶85 Likewise, the majority opinion overstates the scope of the alleged victim intimidation. Although the majority opinion correctly states that Salinas made hundreds of phone calls from jail to M.S. and V.G. while awaiting sentencing on the domestic abuse charges,[19] the majority opinion conveniently omits the fact that only a handful of such calls were actually completed.

¶86 Third, the sexual assault charges and the victim intimidation charges were not based on the same act or transaction or on two or more acts or transactions connected

---

[19] Majority op., ¶5.

15

together. No connection existed between the jail phone calls and the sexual assault charges.

¶87 With no factual support whatsoever, the majority opinion asserts that "Salinas arguably engaged in one crime to prevent disclosure and punishment for another."[20] As the court of appeals put it, "[t]here was no connection between the jail phone calls and the sexual assault allegations. The coercive phone calls were related only to sentencing in the domestic abuse case. Indeed, the sexual assault allegations and charges did not arise until after the domestic abuse case sentencing hearing had concluded."[21]

¶88 Simply put, the only support for the majority opinion's assertion that Salinas made the intimidating phone calls in an effort to prevent disclosure of and punishment for the sexual assaults is the majority's speculation about Salinas's motives.

¶89 Fourth, the majority opinion makes the unsupported assertion that "[t]he State presented evidence that all of Salinas's crimes constituted parts of his common scheme or plan to use threats, intimidation, physical and sexual abuse to maintain power and control over" M.S. and V.G. "so he could break the law without risk of getting caught."[22]

---

[20] See majority op., ¶38.

[21] See State v. Salinas, No. 2013AP2686, unpublished slip op., ¶24 (Wis. Ct. App. Apr. 21, 2015) (emphasis added).

[22] See majority op., ¶46.

16

¶90 No evidence was presented that Salinas had a common scheme or plan to intimidate and control M.S. and V.G. The only "evidence" of such a scheme is the offenses themselves and the majority's unsupported inferences and conjecture. As the court of appeals put it, "[i]t appears the State may believe it was appropriate to join the cases because the victim intimidation and sexual assault allegations generally demonstrated Salinas's character trait of being manipulative. If so, that does not satisfy the joinder requirements of [Wis. Stat.] § 971.12(1)."[23]

¶91 I agree with the court of appeals. Neither the State nor this court can justify joinder under Wis. Stat. § 971.12(1) by speculation and conjecture.

¶92 Moreover, I agree with the defendant and the court of appeals that the circuit court's decision that it was correct as a matter of law under Wis. Stat. § 971.12(1) to permit joinder of the sexual assault charges and the victim intimidation charges against Salinas was prejudicial to the defendant. Improper joinder is presumptively prejudicial, and the State must rebut the presumption of prejudice by proving the error was harmless.[24]

¶93 The State argues that any error in joining the sexual assault charges and the victim intimidation charges against Salinas was harmless because (1) the evidence of Salinas's guilt

---

[23] State v. Salinas, No. 2013AP2686, unpublished slip op., ¶27 (Wis. Ct. App. Apr. 21, 2015).

[24] See Leach, 124 Wis. 2d at 672-73.

17

on the sexual assault charges was overwhelming; and (2) the evidence of the domestic abuse incident would have been admitted in a separate trial as contextual "other acts" evidence.[25]

¶94  I disagree with the State's arguments.

¶95  First, the evidence of Salinas's guilt of the sexual assaults was not overwhelming.  As the court of appeals put it, this was "a classic 'he-said, she-said' case," in which there was no physical evidence or third-party witness reinforcing V.G.'s allegations.[26]

¶96  Second, in assessing "other acts" evidence, we ask whether (1) the evidence is offered for a permissible purpose under Wis. Stat. § (Rule) 904.04(2); (2) the evidence is relevant under Wis. Stat. § 904.01; and (3) the probative value of the evidence outweighs the potential prejudice or risk of confusion.[27]

¶97 Even assuming for the sake of argument that the evidence of the victim intimidation charges (and domestic violence) was relevant and offered for a permissible purpose, the potential prejudice and risk of confusion far outweigh the

---

[25] See State v. Shillcutt, 116 Wis. 2d 227, 236, 341 N.W.2d 716 (Ct. App. 1983) ("[A]n accepted basis for the admissibility of evidence of other crimes arises when such evidence furnishes part of the context of the crime or is necessary to a full presentation of the case.") (internal quotation marks and quoted source omitted).

[26] See State v. Salinas, No. 2013AP2686, unpublished slip op., ¶36 (Wis. Ct. App. Apr. 21, 2015).

[27] See State v. Sullivan, 216 Wis. 2d 768, 783, 576 N.W.2d 30 (1998).

18

probative value. V.G. alleged 40 to 50 sexual assaults over a period of two and a half years. The fact that one of the alleged sexual assaults occurred on the same day as the domestic violence incident (which in turn led to the intimidating phone calls——all of which occurred after the last sexual assault and before the sexual assaults were reported) is simply not sufficiently probative to outweigh the substantial risk of prejudice to Salinas.

¶98 In sum, I would affirm the decision of the court of appeals.

¶99 In closing, I note that the court of appeals' decision in the instant case was an unpublished per curiam decision. When the court granted review in the instant case, I wrote separately, in a comment appended to the order, noting:

> The Wisconsin Court of Appeals Internal Operating Procedures explains that per curiam opinions do not involve "new or unsettled questions of general importance."
>
> . . . .
>
> I write to urge the court to keep in mind Attorney Michael S. Heffernan's cautionary comment at § 23.14 in his book entitled Appellate Practice and Procedure in Wisconsin (6th ed. 2014): "[There is] considerable discrepancy in the quality of the petitions [the Wisconsin Supreme Court] grants. To control its calendar [in fear of being inundated] the court may deny arguably meritorious petitions and then may end up granting petitions for little apparent reason other than filling its calendar."

¶100 This court's criteria for granting review are set forth in Wis. Stat. § (Rule) 809.62(1r) and emphasize the law-developing role of this court. Despite this court's law-

19

developing role, 26% of the court's docket this term is expected to be reviews of per curiam decisions of the court of appeals——the highest rate in more than 20 years.[28]

¶101 Neither this court nor the court of appeals developed the law in the instant case.  Without developing the law, this court is not fulfilling its role and is instead serving as an error-correcting court.  Unfortunately, it is the majority opinion, not the court of appeals, that errs in the instant case.

¶102 For the reasons set forth, I dissent and write separately.

¶103 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[28] See Alan Ball, Is the Court of Appeals Responsible for the Supreme Court's Per Curiam Diet?, SCOWStats, Apr. 26, 2016, http://www.scowstats.com/2016/04/26/is-the-court-of-appeals-responsible-for-the-supreme-courts-per-curiam-diet/; see also Alan Ball, Justice Abrahamson's Concerns Over the Docket - An Update, SCOWStats, Mar. 20, 2016, http://www.scowstats.com/2016/03/20/justice-abrahamsons-concerns-over-the-docket-an-update/; Alan Ball, Justice Abrahamson's Concerns Over the 2015-16 Docket, SCOWStats, Oct. 15, 2015, http://www.scowstats.com/2015/10/15/justice-abrahamsons-concerns-over-the-2015-16-docket-2/.