COURT OF APPEALS
DECISION
DATED AND FILED

**February 27, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP2382**

Cir. Ct. No. 2025GN7

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

IN THE MATTER OF THE GUARDIANSHIP OF D. G. N.:

GRANT COUNTY DEPARTMENT OF SOCIAL SERVICES,

    PETITIONER-RESPONDENT,

  V.

D. G. N.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Grant County: ROBERT P. VAN DE HEY, Judge. *Reversed*.

¶1 KLOPPENBURG, J.[1] Grant County ("the County") and D.G.N. stipulated to guardianship and protective placement for D.G.N. However, the County and D.G.N. disagreed as to whether D.G.N. should also be subject to an associated order for the involuntary administration of psychotropic medication (the "medication order"). After taking evidence on the question, the circuit court entered a medication order, and D.G.N. appealed. I conclude that the medication order cannot stand for two independent reasons. First, the County did not show that a "physician has prescribed psychotropic medication" to D.G.N., as required under WIS. STAT. § 55.14(3)(a). Second, the County did not introduce sufficient evidence that absent involuntary administration of psychotropic medication, there was a "substantial probability" of one of the harms contemplated by § 55.14(3)(e). Accordingly, I reverse the medication order.

## BACKGROUND

¶2 D.G.N. is diagnosed with schizophrenia. In February 2025, the County filed petitions for guardianship of the person and of the estate and for protective placement of D.G.N., and later filed a petition for a medication order. In May 2025, at the commencement of the hearing on these petitions, the parties informed the circuit court that they had reached agreement on two of the petitions: D.G.N. agreed with the guardianship and would not contest the protective placement. Thus, only the petition for a medication order remained in dispute, and the hearing was conducted on that petition alone.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

¶3 Although the hearing addressed several matters required by the governing statute, WIS. STAT. § 55.14, this appeal concerns only the following two issues: (1) whether D.G.N. had been prescribed psychotropic medication by a physician in accord with § 55.14(3)(a); and (2) whether D.G.N., if not involuntarily medicated, would pose a substantial probability of specific harms to himself or to others as specified in § 55.15(3)(e). The evidence relevant to these issues is as follows.

¶4 The County called a single witness: Dr. Martha Rolli, a psychiatrist and the medical director for the County's community services agency. Dr. Rolli testified that, in her role as medical director, she would "sit in on" the weekly meetings held by D.G.N.'s treatment team. She had also reviewed D.G.N.'s record and met with D.G.N. personally in relation to the guardianship case.

¶5 Dr. Rolli testified that D.G.N. was, at the time of the hearing, committed under WIS. STAT. ch. 51 and subject to a medication order associated with that commitment. Asked about the psychotropic medications D.G.N. was prescribed, Dr. Rolli answered: "I am not his prescriber. There is a nurse practitioner here who does the prescribing. But I am the medical director so I review her treatment."

¶6 Dr. Rolli testified that D.G.N. is not competent to refuse psychotropic medication. Asked why, she testified that D.G.N. "doesn't believe he has a mental illness, so he doesn't believe that he needs medication. So, without a court order, I don't believe he would take it." She further testified that D.G.N. had periodically refused to take prescribed psychotropic medications voluntarily. She testified that there had been times when County staff had to call

the police and have D.G.N. brought to the emergency room before he would accept medication.

¶7    Asked whether, if psychotropic medications were not involuntarily administered, D.G.N. would "incur a substantial probability of physical harm, impairment, injury … or will present a substantial probability of physical harm to others," Dr. Rolli testified that he would.  Dr. Rolli endorsed statements she had made in a letter filed with the court that "even with medication treatment, [D.G.N.] continues to be symptomatic.  However, without the medication treatment, his condition worsens.  Without medications, [D.G.N.] has repeatedly become a danger to himself and others and is unable to participate at all in satisfying his basic needs, such as his needs for food and housing."

¶8    Dr. Rolli testified that if placed under guardianship and protective placement orders, D.G.N. would receive treatment services through the County, and implied that he would have a different living situation from his then-current one.  She testified that at the time of the hearing, D.G.N. was living in a hotel room and was "unable to keep it up."  She testified that the room was "in a terrible condition, filled with trash" and that D.G.N. "leaves the door open … whether he's there or not."

¶9    At the close of the hearing, the circuit court entered the guardianship and protective placement orders to which the parties had stipulated.  It also found the requirements for involuntary administration of psychotropic medication met, and accordingly entered a medication order.  D.G.N. appeals.

**DISCUSSION**

*I. Introduction and standard of review*

¶10　D.G.N. contends that the medication order must be reversed because the County introduced insufficient evidence to meet two of the statutory requirements for such an order. The first requirement is that the County show that "[a] physician has prescribed psychotropic medication for the individual." *See* WIS. STAT. § 55.14(3)(a) (a petition for a medication order must allege that a physician has prescribed psychotropic medication for the individual) and § 55.14(8) (a court may issue a medication order if the court finds that the allegations in the petition required under sub. (3) are true). D.G.N. contends that this requirement was not met because the testimony showed that a nurse practitioner, rather than a physician, prescribed him psychotropic medication.

¶11　The second requirement is that the County show that without involuntary administration of psychotropic medication, D.G.N. would "incur a substantial probability of physical harm, impairment, injury, or debilitation or … present a substantial probability of physical harm to others." *See* WIS. STAT. § 55.14(3)(e) (a petition for a medication order must allege that, "[u]nless psychotropic medication is administered involuntarily, the individual will incur a substantial probability of physical harm, impairment, injury, or debilitation or will present a substantial probability of physical harm to others") and § 55.14(8) (a court may issue a medication order if the court finds that the allegations in the petition required under sub. (3) are true). The statute specifies that the "substantial probability" of the listed harms must be proved in at least one of two ways. It can be shown by the "individual's history of at least 2 episodes, one of which has occurred within the previous 24 months, that indicate a pattern of overt activity,

5

attempts, threats to act, or omissions that resulted from the individual's failure to participate in treatment, including psychotropic medication, and that resulted [as relevant here, in a] commitment ordered under [WIS. STAT. §] 51.20(13)." § 55.14(3)(e)1. Alternatively, the substantial probability of harm can be shown by "[e]vidence that the individual meets one of the dangerousness criteria set forth in [§] 51.20(1)(a)2.a. to e." § 55.14(3)(e)2. These are the same dangerousness criteria applicable to a mental commitment under WIS. STAT. ch. 51. *Langlade County v. D.J.W.*, 2020 WI 41, ¶30, 391 Wis. 2d 231, 942 N.W.2d 277. D.G.N. argues that neither of these alternative modes of proof was satisfied here.

¶12     The County must prove by clear and convincing evidence that the two requirements at issue are met. WIS. STAT. § 55.14(8). Whether the County met its burden of proof in the circuit court presents a mixed question of law and fact. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "[W]e will uphold a circuit court's findings of fact unless they are clearly erroneous," *D.J.W.*, 391 Wis. 2d 231, ¶24, and "'we accept reasonable inferences from the facts,'" *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (quoted source omitted). However, "whether the facts satisfy the statutory standard" is a question of law that we review independently. *D.J.W.*, 391 Wis. 2d 231, ¶¶25, 47.

> *II. The County did not show by clear and convincing evidence that a physician had prescribed psychotropic medication for D.G.N.*

¶13     As D.G.N. observes, Dr. Rolli, herself a physician, testified that she had not prescribed psychotropic medications to D.G.N. Rather, a nurse practitioner on staff prescribed the medication, though Dr. Rolli, as medical director, "review[ed]" the prescription. Based on this record, I conclude that the County failed to prove by clear and convincing evidence that "a physician has

prescribed psychotropic medication for [D.G.N.]" as WIS. STAT. § 55.14(3)(a) and (8) require.

¶14   The County makes two arguments in response. First it posits that, by virtue of her supervisory role within the agency and her stated practice of "review[ing]" the decisions of the nurse practitioner, Dr. Rolli was "essentially prescribing" the psychotropic medication even though it was the nurse practitioner who actually prescribed it.

¶15   This argument is not convincing. The statutory language is clear; a person may not be subject to involuntary administration of psychotropic medication under WIS. STAT. ch. 55 unless "[a] physician has prescribed" it. WIS. STAT. § 55.14(3)(a). Dr. Rolli expressly disavowed having prescribed medication to D.G.N., testifying "I am not his prescriber. There is a nurse practitioner here who does the prescribing." Although Dr. Rolli reviewed these prescriptions, the statute does not permit involuntary administration of psychotropic medication to a person where a physician has "reviewed" the prescription; a physician must have "prescribed" it.

¶16   While "prescribe" and related words are not defined within WIS. STAT. ch. 55, it is a common and widely understood term that requires no particular definition. *See State v. Salinas*, 2016 WI 44, ¶45, 369 Wis. 2d 9, 879 N.W.2d 609 (referring to phrase "common scheme or plan" in WIS. STAT. § 971.12(1) as "common words with known meanings"). Moreover, "psychotropic medication" is defined in ch. 55 as "a prescription drug" used to treat or manage psychiatric conditions. WIS. STAT. § 55.01(6s). This statute refers to the description of "prescription drug" found at WIS. STAT. § 450.01(20); the next subsection of that statute defines "prescription order" as an order "transmitted

orally, electronically or in writing by a practitioner for a drug or device for a particular patient." § 450.01(21). A prescription, then, is an order made by a particular practitioner; it is not something attributable to any practitioner by some association with the prescribing practitioner.

¶17 The County's second argument on this issue depends on a recent enactment, 2025 Wis. Act 17, which will expand the ability of certain nurse practitioners to act independently, without a collaborative agreement with a physician. This change in the statutes does not go into effect until September 1 of this year. 2025 Wis. Act 17, § 173. It is therefore hard to see how this provision could alter the County's obligations of proof at a hearing that occurred in May 2025. But there is a more basic reason the Act does not affect the issue in this case: it makes no change to the statute at issue in this case. Though 2025 Wis. Act 17 may broaden certain nurse practitioners' ability to prescribe medication, it does not amend WIS. STAT. § 55.14(3)(a) to remove the requirement that a "physician has prescribed psychotropic medication" for the person. The legislature could amend WIS. STAT. ch. 55 to permit involuntary administration of psychotropic medication when the medication is prescribed by someone other than a physician, but it has not done so. This court is obligated to apply the statutes as they are written, and nothing in the existing statutes or the soon-to-be-effective 2025 Wis Act 17 permits a court to order the involuntary administration of psychotropic medications when the medications have been prescribed by a nurse practitioner.

> III. *The County did not show by clear and convincing evidence a substantial probability of the harms enumerated in* WIS. STAT. *§ 55.14(3)(e).*

¶18 Although the absence of a physician's prescription of psychotropic medication would require reversal of the medication order here, D.G.N. advances

8

an additional argument: that the County did not prove, by either of the two evidentiary paths available, that without involuntary administration of psychotropic drugs, he would demonstrate a substantial probability of harm to himself or others, as is required by WIS. STAT. § 55.14(3)(e). The County responds by arguing that it met its burden as to each of the alternative means of proving this substantial probability of harm. I will address these in turn.

¶19 As stated, the statute permits a finding of a substantial probability of harm when the individual has a "history of at least 2 episodes, one of which has occurred within the previous 24 months, that indicate a pattern of overt activity, attempts, threats to act, or omissions that resulted from the individual's failure to participate in treatment, including psychotropic medication, and that resulted in a … commitment ordered under [WIS. STAT. §] 51.20 (13)." WIS. STAT. § 55.14(3)(e)1.

¶20 The County argues that it proved the existence of two such episodes, but the record does not support this argument. It is true that at the time of the hearing in this case, D.G.N. was under a WIS. STAT. ch. 51 commitment order. But the County adduced no evidence at the hearing about what had led to this commitment order, or even when it was entered. The County points to two documents in the record that, it says, provide evidence tying the ch. 51 order to "2 episodes … that indicate a pattern" of dangerous behavior "that resulted from [D.G.N.]'s failure to participate in treatment, including psychotropic medication." WIS. STAT. § 55.14(3)(e)1. But these documents provide scant information.

¶21 One document is a letter prepared by Dr. Rolli. It asserts that D.G.N. "has a long history of noncompliance with treatment." It states that he "has been under Chapter 51 commitment." Regarding D.G.N.'s prior behavior,

9

the letter states: "Examples of dangerous behavior include physically assaulting his mother in 2023[,] reporting that he wanted to get a gun to shoot himself in 2024[,] and refusing to eat in 2024 because he believed the food he was given was poisoned leading to weight loss." While any or all of these events may qualify as "overt activity, attempts, threats to act, or omissions" under the statute, the letter does not say whether any of them "resulted in" the commitment to which D.G.N. was subject to at the time of the hearing in this case. Nor does the letter provide any evidence that these events "resulted from [D.G.N.]'s failure to participate in treatment, including psychotropic medication." WIS. STAT. § 55.14(3)(e)1.

¶22 The second document on which the County relies is the comprehensive evaluation of D.G.N., which was prepared by a County employee and filed pursuant to WIS. STAT. § 55.11(1) a couple of months before the hearing. This document reports that D.G.N. "had an incident whe[n] he did physically push [his mother] down." It continues that D.G.N. "ended up going to jail for a couple months during this timeframe before then being admitted to Mendota Mental Health where he was discharged eventually six months later." Another portion of this report suggests that D.G.N.'s time at Mendota ended after D.G.N. was found not competent in a criminal case in September 2024, after which WIS. STAT. ch. 51 proceedings commenced. Though it is not explicitly stated in this document, one could reasonably surmise that the incident in which D.G.N. allegedly pushed his mother down eventually resulted in a ch. 51 commitment, and that this incident occurred within 24 months of the filing of the petition. There are also statements in the document that suggest D.G.N. was at least somewhat noncompliant with his medication around the time of this incident. But even if it were reasonable for a court to supply all the necessary inferences—which the court would have to do, because the document is rather vague and none of these matters were discussed at

10

the hearing—they would, at most, amount to one qualifying incident under WIS. STAT. § 55.14(3)(e)1. The statute requires two such incidents of "overt activity, attempts, threats to act, or omissions."

¶23 The County argues that it is sufficient that Dr. Rolli's letter mentions additional alleged behaviors by D.G.N.—wanting to buy a gun and shoot himself, and refusing to eat, both at some point in 2024—but there is nothing in the record that would permit a court to conclude that these incidents were brought on by noncompliance with treatment or medication, and nothing in the record that shows that these incidents led to D.G.N.'s commitment under WIS. STAT. ch. 51. Similarly, though the letter suggests that D.G.N. has had one or more prior ch. 51 commitments, it gives no information at all about the circumstances that led to commitment. In sum, I conclude that the County failed to adduce evidence sufficient to support a medication order under WIS. STAT. § 55.14(3)(e)1.

¶24 The County also argues that it proved a "substantial probability" of harm by the alternative evidentiary route established in WIS. STAT. § 55.14(3)(e)2. That is, the County argues that it proved a substantial probability of harm by showing D.G.N. to be dangerous under the standards of WIS. STAT. § 51.20. *See* § 55.14(3)(e)2. Specifically, the County submits that it proved the dangerousness criterion in § 51.20(1)(a)2.e., often called the "fifth standard."

¶25 The fifth standard has five elements. *State v. Dennis H.*, 2002 WI 104, ¶18, 255 Wis. 2d 359, 647 N.W.2d 851. The first two elements—that the person be mentally ill, and that because of mental illness, be unable to make an informed choice as to whether to accept or refuse medication or treatment—are not disputed here. *See id.*, ¶¶19-21 (explaining these elements). The third element is that the person "show a substantial probability that [the individual] needs care or

11

treatment to prevent further disability or deterioration. This must be demonstrated by both the individual's treatment history and [the individual's] recent acts or omissions." *Id.*, ¶22 (citations and internal quotation marks omitted). The parties dispute this element, but I will focus on the fourth and fifth elements.

¶26 The fourth element requires that the person evidence a "'substantial probability that [the individual] will, if left untreated, lack services necessary for [the individual's] health or safety.'" *Id.*, ¶23 (quoted source omitted). The County argues that this standard is met because D.G.N. has a history of refusing or resisting medication, and because, around the time of the hearing, he was living in a hotel room that was "in terrible condition, filled with trash" and where he kept his door open. The County also points to Dr. Rolli's statement, in her letter, that D.G.N. "is unable to participate at all in satisfying his basic needs, such as his needs for food and housing."

¶27 I conclude that the County did not prove this element. While D.G.N.'s living situation at the time of the hearing may not have been desirable, there was no evidence that it was affecting his "health or safety." *Id.* Moreover, as noted above, at the commencement of that hearing, D.G.N. stipulated to both guardianship and protective placement. D.G.N. was therefore, as noted by Dr. Rolli, entering a different living situation maintained by his corporate guardian, in which his housing needs would be addressed, and the County did not explain how his "health or safety" might be threatened in this new environment. Similarly, as for Dr. Rolli's noting in her letter that at some point in 2024 D.G.N. lost weight due to refusing to eat, the letter does not establish that he was still refusing to eat or that D.G.N.'s food needs would not also be addressed through the protective placement.

¶28    The fifth element required the County to show "'a substantial probability that [D.G.N.] will, if left untreated, ... suffer severe mental, emotional, or physical harm that will result in the loss of [his] ability to function independently in the community or the loss of cognitive or volitional control over his … thoughts or actions.'"  *Id.*, ¶24 (quoted source omitted).  Here as with the previous element, the evidence to which the County points falls short of showing a "substantial probability" that D.G.N. will suffer "severe" harm if not subject to a medication order.  The record is simply insufficient, both about events in D.G.N.'s past and about his condition at the time of the hearing.

¶29    The County may well be able to prove that the "substantial probability of physical harm" requirements in WIS. STAT. § 55.14(3)(e) are met at a subsequent hearing, but, for the reasons stated, the record does not show that the County did so here.

## CONCLUSION

¶30    For the foregoing reasons, I reverse the order for involuntary administration of psychotropic medication.

*By the Court.*—Order reversed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.